### BUELL INDUSTRIES, INC. *v.* GREATER NEW YORK MUTUAL INSURANCE COMPANY ET AL.
### (SC 16464)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

---

Argued September 20, 2001—officially released February 26, 2002

*Francis J. Brady*, with whom were *Austin Carey, Jr.*, *John S. Vishneski III* and, on the brief, *Angela Elbert Dietz*, for the appellant (plaintiff).

*Joel M. Fain*, with whom were *Jay D. Kenigsberg*, pro hac vice, *Thomas C. Clark*, and, on the brief, *Erich H. Gaston* and *Glory M. Lena*, for the appellees (defendant Federal Insurance Company et al.).

*Laura A. Foggan*, pro hac vice, *Daniel E. Troy*, pro hac vice, *Danielle E. Berry*, pro hac vice, *Daniel P. Scapellati* and *John B. Farley*, filed a brief for the Insurance Environmental Litigation Association as amicus curiae.

*W. James Cousins, Jr.*, *Eugene R. Anderson*, pro hac vice, *Robert M. Horkovich*, pro hac vice, *Mark Garbowski*, pro hac vice, *Amy Bach*, pro hac vice, and *Brian T. Valery*, law clerk, filed a brief for the United Policyholders as amicus curiae.

*Opinion*

NORCOTT, J. This appeal arises from a dispute regarding whether the comprehensive general liability policies issued by the defendant insurers provide coverage for the environmental claims asserted by the plaintiff. More specifically, we are asked, in part, to interpret the meaning and applicability of the "sudden and accidental" exception to the pollution exclusion contained in the defendants' insurance policies. The plaintiff, Buell Industries, Inc., filed a declaratory judgment action against the defendants, Federal Insurance Company (Federal) and Chicago Insurance Company (Chicago), after they had denied coverage. The defendants moved for summary judgment and the trial court, *Koletsky, J.*,

ruled in favor of the defendants. The plaintiff appealed from the judgment of the trial court. We now affirm the judgment of the trial court.

The following are the relevant facts and procedural history. The plaintiff is a Delaware corporation with its principal place of business in Waterbury, Connecticut. The issues in this appeal concern two manufacturing facilities owned by the plaintiff: Highland Manufacturing (Highland) and Anchor Fasteners (Anchor), both of which are located in Waterbury. The plaintiff manufactures metal parts at each of the facilities. In 1990, the plaintiff began an environmental investigation of the facilities. The investigation revealed that both sites were contaminated.[1] According to the plaintiff, each of

---

[1] More specifically, the plaintiff engaged in an environmental investigation of its plants pursuant to the statutes pertaining to the transfer of hazardous waste establishments. General Statutes (Rev. to 1989) § 22a-134 et seq. The plaintiff was required to comply with these statutory provisions due to a sale of its stock and merger into ITW Acquisition, Inc., on July 18, 1990. Following this sale, ITW Acquisition, Inc., changed its name to Buell Industries, Inc.

In 1990, General Statutes (Rev. to 1989) § 22a-134a required that prior to the transfer of an establishment, the owner of the establishment must submit a "negative declaration" to the commissioner of environmental protection. The " '[n]egative declaration' " required to be filed was a "written declaration . . . stating (1) that there has been no discharge, spillage, uncontrolled loss, seepage or filtration of hazardous waste on-site, or that any such discharge, spillage, uncontrolled loss, seepage or filtration has been cleaned up in accordance with procedures approved by the commissioner or determined by him to pose no threat to human health or safety or the environment which would warrant containment and removal or other mitigation measures and (2) that any hazardous waste which remains on-site is being managed in accordance with this chapter and chapter 446k and regulations adopted thereunder . . . ." General Statutes (Rev. to 1989) § 22a-134 (5). Because the results of the environmental investigation revealed contamination, the plaintiff was unable to submit a negative declaration to the commissioner. The plaintiff was therefore required by law to comply with General Statutes (Rev. to 1989) § 22a-134a (c), which provides: "If the owner or operator is unable to submit a negative declaration, prior to the transfer the transferee or other party to the transfer shall certify to the commissioner that to the extent necessary to minimize or mitigate a threat to human health or the environment, he shall contain, remove or otherwise mitigate the effects of any discharge, spillage, uncontrolled loss, seepage or filtration of hazardous

the sites was contaminated as a result of releases that had occurred during and after 1966.

The contamination at issue in this case concerns primarily groundwater pollution. At Highland, the significant source of contamination was trichloroethylene (TCE), which was located beneath the plant's former wastewater lagoon. TCE existed in this area in a dense nonaqueous phase liquid form, that was not fully dissolved in the groundwater and spread from the lagoon area to neighboring properties through the groundwater.

The Highland facility utilized a two stage degreasing machine, that used TCE in both liquid and vapor forms. Metal parts were placed into the degreasing tank in order to remove grease and dirt. The parts were then raised out of the liquid TCE and placed into the vapor TCE for continued cleaning and drying. Virgin TCE was typically stored in barrels in the room containing the degreasing unit. While there is no disagreement that TCE existed in the groundwater at Highland, how it got there is very much disputed.

Anchor produces a variety of metal products, including screws, nuts, rivets and clips. At Anchor, the main source of contamination at issue in this case was oil or, more specifically termed, total petroleum hydrocarbon (TPH).[2] In 1986, an underground waste oil tank (tank)

waste on-site in accordance with procedures and a time schedule approved by the commissioner pursuant to an order, stipulated judgment or consent agreement." On July 18, 1990, ITW Acquisition, Inc., filed a certification with the commissioner of environmental protection with respect to both the Highland and Anchor facilities.

[2] The contamination at the Anchor site was the subject of a consent order entered into by the plaintiff and the department of environmental protection (department) on January 20, 1993. Because the plaintiff was unable to file a negative declaration pursuant to General Statutes (Rev. to 1989) § 22a-134a, the plaintiff agreed in the consent order to undertake remedial actions at Anchor. These actions included the abatement, to the satisfaction of the commissioner of the department, of all "soil, surface water and ground water pollution which is on, is emanating from or emanated from [the

was removed from the loading dock area at Anchor. During this excavation, a former dry well, approximately six and one-half feet in depth, was discovered. The dry well was deconstructed and removed along with the tank. Despite the removal of the tank and the dry well, TPH contamination in the soil was discovered and, in 1994, approximately 800 cubic yards of soil were removed from the area. Nevertheless, monitoring wells installed at the site have indicated the periodic flow of free phase oil in this location. A passive oil collection system was installed in order to abate the contamination. Again, as with the Highland site, the parties do not disagree that the Anchor site is contaminated, although the cause of TPH contamination and the insurers' responsibility for the costs of its remediation are disputed.

The plaintiff filed claims with its insurers, including Federal and Chicago,[3] for the costs of remediating the environmental contamination at Highland and Anchor. The plaintiff sought coverage, under the insurance contracts' property damage and personal injury provisions, for its costs associated with the investigation and cleanup of the contamination at the Highland and Anchor facilities. Both Federal and Chicago denied coverage.

The insurance policies can be described more specifically as follows.[4] Federal provided primary comprehen-

---

Anchor] property . . . ." Most of the soil removal was conducted between December, 1993, and June, 1994.

[3] Six defendants were originally named in the plaintiff's revised complaint for declaratory judgment, dated January 22, 1999. Federal and Chicago are the only remaining defendants.

[4] The Supreme Court of Florida aptly summarized the development of the comprehensive general liability insurance policy: "Before 1966, the standard [comprehensive general liability] policy covered only property and personal injury damage that was caused by accident. . . . In 1966 the insurance industry switched to occurrence-based policies in which the term occurrence was defined as an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured. . . . Beginning

sive general liability insurance to the plaintiff for the period from February 1, 1975, through February 1, 1986. Chicago's policies provided umbrella liability insurance to the plaintiff for the period from February 1, 1980, through February 1, 1985.[5] The Federal and Chicago policies both provide coverage for property damage

in 1970, the pollution exclusion clause . . . was added to the standard policy. Finally, the policy was again changed in 1984 by the addition of what has been called an absolute exclusion clause, which totally excludes coverage for pollution cleanup costs that arise from governmental directives." (Citations omitted; internal quotation marks omitted.) *Dimmitt Chevrolet, Inc.* v. *Southeastern Fidelity Ins. Corp.*, 636 So. 2d 700, 702–703 (Fla. 1993).

[5] The Federal comprehensive general liability insurance policy in effect from February 1, 1975, to February 1, 1977, contains the following coverage clause: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or property damage to which this insurance applies, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . ." The Federal comprehensive general liability insurance policy in effect from February 1, 1977, through February 1, 1986, contains the following coverage clause: "The company will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages by reason of liability to which this insurance applies, imposed by law or assumed by the insured under any written contract, for bodily injury, property damage or personal injury caused by an occurrence and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury, property damage or personal injury, even if any of the allegations of the suit are groundless, false or fraudulent . . . ." The Chicago umbrella insurance policy in effect from February 1, 1980, through February 1, 1985, contains the following coverage clause: "The company agrees to indemnify the insured for all sums which the insured shall become obligated to pay as damages, direct or consequential, and expenses, all as hereinafter defined as included within the term ultimate net loss, by reason of liability (a) imposed upon the insured by law, or (b) assumed by the named insured, or by any officer, director, stockholder or employee thereof while acting within the scope of his duties as such, under any contract or agreement, because of personal injury, property damage, or advertising liability caused by or arising out of an occurrence which takes place during the policy period anywhere in the world." We note that the Chicago policy in effect from February 1, 1984, to February 1, 1985, uses slightly different wording but is substantively the same as the earlier policies.

and personal injury. The policies are occurrence based insurance. Insurance is provided on a per occurrence basis with "occurrence" defined, in the Federal policy effective February 1, 1975,[6] as "an accident, including continuous or repeated exposure to conditions, which results, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Each of the policies at issue in this case includes a pollution exclusion clause. While the wording of each differs slightly,[7] both exclude from coverage any claims that are the result of the discharge of pollutants. The policies, however, also contain an exception to the pollution exclusion. This is the so-called "sudden and accidental" exception, which reinstates coverage when the release of pollutants is "sudden and accidental."[8] In other words, the pollution exclusion makes clear that pollution related claims are excluded from coverage unless the claim is based on a release of pollutants that is "sudden and accidental." We emphasize that the focus of the pollution exclusion is on the *release* or *discharge* of the pollutants, which must be "sudden and accidental," rather than on the damage caused by such an event.

In response to the denials of coverage, the plaintiff filed an action for declaratory judgment on January

---

[6] The definitions of the term "occurrence" in the 1977 Federal policy and in the Chicago policies differ slightly from the 1975 Federal policy. The differences, however, are not relevant for our purposes.

[7] The pollution exclusion in the Federal policies excludes from coverage claims for "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acid, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water . . . ."

The Chicago policies' pollution exclusion clause is nearly identical, except that the Chicago policies use "personal injury" in place of "bodily injury."

[8] The "sudden and accidental" exception is identical in all of the policies. It provides: "[B]ut this [pollution] exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

26, 1999. The plaintiff sought a judgment by the court declaring Federal and Chicago jointly and severally liable for the sums the plaintiff had paid, and that it will pay, with respect to the contamination at the Highland and Anchor sites. After the trial court granted the defendants' motion to strike the plaintiff's claim for attorney's fees, the plaintiff filed a notice of intent to appeal.

On June 9, 2000, Federal and Chicago moved for summary judgment, asserting that: (1) the insurance policies' pollution exclusion clause precludes coverage; (2) none of the plaintiff's claims constitutes "personal injury" as that term is defined in the insurance policies; and (3) the sums expended by the plaintiff are ordinary business expenses and not "damages" as required by the insurance policies. Additionally, Chicago asserted that: its excess insurance policy would not be reached since a pro rata allocation of the plaintiff's damages would prevent the policy from being triggered. The trial court rendered summary judgment for the defendants, ruling that, as a matter of law, the plaintiff's claims do not fall within the "personal injury" provisions of the defendants' insurance policies. The court also held that there exists no genuine issue of material fact that any of the discharges were, as required by the insurance policies, "sudden."[9] The plaintiff appealed to the Appellate Court, and we transferred the case to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).[10]

The plaintiff makes three arguments on appeal. The plaintiff argues, first, that the trial court improperly concluded that the "sudden and accidental" exception

[9] The trial court did not reach the question of whether these claims constitute "damages" under the insurance policies, nor did it reach Chicago's claim regarding allocation. We granted the plaintiff's motion to defer briefing regarding allocation, but denied it as to the "damages" issue.

[10] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . ."

to the pollution exclusion did not apply to the environmental contamination in this case. Second, the plaintiff argues that the trial court improperly rendered summary judgment for the defendants because a genuine issue of material fact exists regarding whether the contamination occurred slowly or abruptly. Finally, the plaintiff argues that the trial court improperly concluded that the personal injury provisions of the policy do not provide coverage for the environmental contamination at issue in the case. We examine each of these contentions in turn.[11]

I

We first address the plaintiff's contention that the trial court improperly granted the motion for summary judgment in favor of the defendants on account of the pollution exclusion clause. The plaintiff argues that the "sudden and accidental" exception to the pollution exclusion clause covers these releases because the term "sudden" should be understood to mean unexpected and not necessarily quick or abrupt. The plaintiff maintains, in other words, that even though the discharges may have occurred over a period of years, the defendants' insurance policies should provide coverage so long as the releases were unexpected and accidental. We disagree with the plaintiff and conclude that the term "sudden," as used in the policies, includes a temporal quality, which requires that the onset of the release in question occurs quickly or happens abruptly.

The meaning of the pollution exclusion is an issue of first impression in this state, although Connecticut trial courts uniformly have interpreted the term "sud-

---

[11] In their briefs, the parties also addressed whether the plaintiff's claims constitute "damages" as that term is used in the insurance policies and whether the trial court correctly granted the defendants' motion to strike the plaintiff's request for attorney's fees and costs. Our resolution of the case disposes of this case without the need to address these issues.

den" to require a temporally abrupt release of pollutants.[12] Many other state courts, however, already have interpreted the exclusion. Our task would be easier if there existed a clear trend among the courts regarding the meaning of the exclusion. That, however, is not the case. Our research has revealed that the "sudden and accidental" exception has been interpreted to have a temporal meaning by the state Supreme Courts of Delaware, Florida, Idaho, Iowa, Maryland, Massachusetts, Michigan, Minnesota, Montana, New York, North Carolina, Ohio, Oklahoma, Utah and Wyoming.[13] Other

[12] See *Schilberg Integrated Metals* v. *Continental Casualty Co.*, Superior Court, judicial district of New Britain, Docket No. X03 CV 98 0499554 S (April 17, 2001) (29 Conn. L. Rptr. 721); *Zero-Max, Inc.* v. *Liberty Mutual Ins. Co.*, Superior Court, judicial district of Milford at Milford, Docket No. CV 97 0059915S (December 6, 1999) (26 Conn. L. Rptr. 108); *Reichhold Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.*, Superior Court, Complex Litigation Docket at Middletown, Docket No. X03-CV 88 0085884S (October 1, 1998) (23 Conn. L. Rptr. 394), rev'd on other grounds, 252 Conn. 774, 750 A.2d 1051 (2000); *Linemaster Switch Corp.* v. *Aetna Life & Casualty Corp.*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV 910396432S (July 31, 1995) (15 Conn. L. Rptr. 223); *Carrier Corp.* v. *Home Ins. Co.*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-88-352383-S (September 21, 1994).

In *Reichhold Chemicals, Inc.* v. *Hartford Accident & Indemnity Co.*, 252 Conn. 774, 750 A.2d 1051 (2000), our decision was limited to whether New York or Washington law should apply in the trial court's interpretation of the pollution exclusion clause. In *Reichhold Chemicals, Inc.*, we therefore did not state our interpretation of the pollution exclusion under Connecticut law.

[13] See *E.I. du Pont de Nemours & Co.* v. *Allstate Ins. Co.*, 693 A.2d 1059 (Del. 1997); *Dimmitt Chevrolet, Inc.* v. *Southeastern Fidelity Ins. Corp.*, 636 So. 2d 700 (Fla. 1993); *North Pacific Ins. Co.* v. *Mai*, 130 Idaho 251, 939 P.2d 570 (1997); *Iowa Comprehensive Petroleum Underground Storage Tank Fund Board* v. *Farmland Mutual Ins. Co.*, 568 N.W.2d 815 (Iowa 1997); *American Motorists Ins. Co.* v. *ARTRA Group, Inc.*, 338 Md. 560, 659 A.2d 1295 (1995); *Lumbermens Mutual Casualty Co.* v. *Belleville Industries, Inc.*, 407 Mass. 675, 555 N.E.2d 568 (1990); *Auto-Owners Ins. Co.* v. *Clare*, 446 Mich. 1, 521 N.W.2d 480, rehearing denied, 447 Mich. 1202, 525 N.W.2d 450 (1994); *Board of Regents of the University of Minnesota* v. *Royal Ins. Co. of America*, 517 N.W.2d 888 (Minn. 1994); *Sokoloski* v. *American West Ins. Co.*, 294 Mont. 210, 980 P.2d 1043 (1999); *Northville Industries Corp.* v. *National Union Fire Ins. Co. of Pittsburgh, PA.*, 89 N.Y.2d 621, 679 N.E.2d 1044, 657 N.Y.S.2d 564 (1997); *Waste Management of Carolinas, Inc.* v.

states, however, have construed the "sudden and accidental" exception in favor of coverage for gradual pollution, either by finding the word "sudden" to be ambiguous or by estopping insurers from denying coverage.[14]

We note that " '[u]nder our law, the terms of an insurance policy are to be construed according to the general rules of contract construction. See, e.g., *Weingarten* v. *Allstate Ins. Co.*, 169 Conn. 502, 509–10, 363 A.2d 1055 [(1975), overruled in part on other grounds, *Streitweiser* v. *Middlesex Mutual Assurance Co.*, 219 Conn. 371, 593 A.2d 498 (1991)]; *A. M. Larson Co.* v. *Lawlor Ins. Agency, Inc.*, 153 Conn. 618, 622, 220 A.2d 32 [1966]. The determinative question is the intent of the parties, that is, what coverage the . . . [plaintiff] expected to

*Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374, rehearing denied, 316 N.C. 386, 346 S.E.2d 134 (1986); *Hybud Equipment Corp.* v. *Sphere Drake Ins. Co., Ltd.*, 64 Ohio St. 3d 657, 597 N.E.2d 1096, rehearing denied, 65 Ohio St. 3d 1445, 600 N.E.2d 686 (1992), cert. denied, 507 U.S. 987, 113 S. Ct. 1585, 123 L. Ed. 2d 152 (1993); *Kerr-McGee Corp.* v. *Admiral Ins. Co.*, 905 P.2d 760 (Okla. 1995); *Sharon Steel Corp.* v. *Aetna Casualty & Surety Co.*, 931 P.2d 127 (Utah 1997); *Sinclair Oil Corp.* v. *Republic Ins. Co.*, 929 P.2d 535 (Wyo. 1996).

[14] These states include: Alabama, Colorado, Georgia, Illinois, Indiana, New Hampshire, New Jersey, Oregon, Rhode Island, South Carolina, Washington, West Virginia and Wisconsin. See *Alabama Plating Co.* v. *United States Fidelity & Guaranty Co.*, 690 So. 2d 331 (Ala. 1996); *Hecla Mining Co.* v. *New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo. 1991); *Claussen* v. *Aetna Casualty & Surety Co.*, 259 Ga. 333, 380 S.E.2d 686 (1989); *Outboard Marine Corp.* v. *Liberty Mutual Ins. Co.*, 154 Ill. 2d 90, 607 N.E.2d 1204 (1992); *American States Ins. Co.* v. *Kiger*, 662 N.E.2d 945 (Ind. 1996); *Hudson* v. *Farm Family Mutual Ins. Co.*, 142 N.H. 144, 697 A.2d 501 (1997); *Morton International, Inc.* v. *General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, 512 U.S. 1245, 114 S. Ct. 2764, 129 L. Ed. 2d 878, rehearing denied, 512 U.S. 1277, 115 S. Ct. 25, 129 L. Ed. 2d 923 (1994); *St. Paul Fire & Marine Ins. Co.* v. *McCormick & Baxter Creosoting Co.*, 324 Or. 184, 923 P.2d 1200 (1996); *Textron, Inc.* v. *Aetna Casualty & Surety Co.*, 754 A.2d 742 (R.I. 2000); *Greenville* v. *Ins. Reserve Fund*, 313 S.C. 546, 443 S.E.2d 552 (1994); *Queen City Farms, Inc.* v. *Central National Ins. Co. of Omaha*, 126 Wash. 2d 50, 882 P.2d 703 (1994); *Joy Technologies, Inc.* v. *Liberty Mutual Ins. Co.*, 187 W. Va. 742, 421 S.E.2d 493 (1992); *Just* v. *Land Reclamation, Ltd.*, 155 Wis. 2d 737, 456 N.W.2d 570 (1990).

receive and what the defendant was to provide, as disclosed by the provisions of the policy. *Marcolini* v. *Allstate Ins. Co.*, 160 Conn. 280, 283, 278 A.2d 796 [1971].' " *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, 231 Conn. 756, 769–70, 653 A.2d 122 (1995).

" '[E]ach and every sentence, clause, and word of a contract of insurance should be given operative effect. Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction . . . .' " *Hansen* v. *Ohio Casualty Ins. Co.*, 239 Conn. 537, 548, 687 A.2d 1262 (1996), quoting 2 G. Couch, Insurance (3d Ed. 1995) c. 22, § 22.43, pp. 22-90 through 22-92. The exception to the pollution exclusion is expressed in conjunctive terms. For a discharge to be a covered event under the policy, it must be *both* sudden and accidental. If one or the other of these conditions is absent, then the discharge is not a covered incident.[15]

We are assisted in our interpretation of the term "sudden" by reference to the dictionary. "To ascertain the commonly approved usage of a word, it is appropriate to look to the dictionary definition of the term. . . . *State* v. *Rivera*, 250 Conn. 188, 200 n.12, 736 A.2d 790 (1999)." (Internal quotation marks omitted.) *Gartrell* v. *Dept. of Correction*, 259 Conn. 29, 41 n.13, 787 A.2d 541 (2002). In 1970, when the pollution exclusion was adopted, "sudden" was defined as follows: "1. Happening without warning; unforeseen. 2. Characterized by hastiness; abrupt; rash. 3. Characterized by rapidity; quick; swift." The American Heritage Dictionary of the English Language (1969). "1. [H]appening, coming, made, or done quickly, without warning, or unexpectedly . . . 2. occurring without transition from the pre-

---

[15] The trial court correctly noted that if the releases in question were not sudden, there is no need to determine whether they were accidental.

vious form, state, etc.; abrupt . . . ." Random House Dictionary of the English Language (1966).

We acknowledge that, the word sudden can be used to describe the unexpected nature, as well as abrupt onset, of the event being described. A "sudden turn in the road" is described as such, because the driver coming upon it does not expect that the road will curve. It is an unexpected curve. Yet, it is also properly sudden because the driver is forced into an abrupt confrontation with the bend in the road as a result of the driver's speed. It would not be a "sudden turn in the road" if, instead of driving it, one approached the curve while walking. Thus, we agree that while sudden generally describes the unexpected nature of an event, it is also often used when the speaker intends to describe a situation that appears in its present state in an abrupt or quickly occurring manner.

While the word may connote either state—or even a combination of both an unexpected and a temporally abrupt quality—in a given context, what matters for our purposes is what the word was intended to mean in the context of the "sudden and accidental" exception to the pollution exclusion. We conclude that the word sudden was included in these policies so that only a temporally abrupt release of pollutants would be covered as an exception to the general pollution exclusion.

In the context of these policies, it makes sense to include, within the definition of sudden, the temporally abrupt quality of the word. This becomes evident through the juxtaposition of the word "sudden" with the word "accidental" in the exception to the pollution exclusion. We agree with the statement by other appellate courts: "The very use of the words sudden and accidental . . . reveal a clear intent to define the words differently, stating two separate requirements. Reading sudden in its context, i.e. joined by the word

and to the word [accident], the inescapable conclusion is that sudden, even if including the concept of unexpectedness, also adds an additional element because unexpectedness is already expressed by accident[al]. This additional element is the temporal meaning of sudden, i.e. abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage. *Mustang Tractor & Equip[ment] Co.* v. *Liberty Mut[ual] Ins. Co.*, 76 F.3d 89, 92 (5th Cir. 1996) . . . ." (Citation omitted; internal quotation marks omitted.) *SnyderGeneral Corp.* v. *Great American Ins. Co.*, 928 F. Sup. 674, 680 (N.D. Tex. 1996), aff'd, 133 F.3d 373 (5th Cir. 1998). We conclude, therefore, that, as used in these policies, the term "sudden" requires that the release in question occurs abruptly or within a short amount of time.

In urging that we construe sudden to mean only unexpected, without any temporal quality, the plaintiff relies on this court's prior interpretation of the term "sudden" in an entirely different context. In *Verdon* v. *Transamerica Ins. Co.*, 187 Conn. 363, 368, 446 A.2d 3 (1982), we stated: "Although 'sudden' may also imply quickness, its primary meaning is unexpected, 'happening without previous notice or very brief notice.' Webster, Third New International Dictionary." This previous statement regarding the meaning of sudden does not assist us in understanding the intended use of the word in the context of the pollution exclusion.

In *Verdon*, wherein we interpreted Connecticut's direct action statute, the issue was whether "a decrease in the value of an estate caused by legal malpractice is 'damage to the property of any person' for purposes of General Statutes § 38-175 [now § 38a-321] . . . ."[16] *Ver-*

[16] General Statutes (Rev. to 1981) § 38-175, now § 38a-321, provides: "Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or damage on account of the bodily injury or death by accident of any person, or *damage to the property of any person*, for which

*don* v. *Transamerica Ins. Co.*, supra, 187 Conn. 364. The trial court had concluded that the plaintiff's financial loss, as administrator of an estate and caused through the attorney's negligence, was not damage to property under the direct action statute. Id., 370. In making this determination, the trial court interpreted the term "casualty" as used in the statute. Id., 365–66. The trial court, relying on Black's Law Dictionary, interpreted the term "casualty" to mean "an accident; event due to *sudden*, unexpected, or unusual cause . . . [a] loss . . . by fire, shipwreck, lightning, etc." (Emphasis added; internal quotation marks omitted.) Id., 366. The trial court concluded that since a loss in the value of an estate through an attorney's negligence is not this type of casualty, the direct action statute was not applicable. Id.

On appeal in *Verdon*, we interpreted the term "casualty" to mean " 'an unfortunate occurrence' synonymous with 'mischance.' Webster, Third New International Dictionary." *Verdon* v. *Transamerica Ins. Co.*, supra, 187 Conn. 368. But, even though we determined that this was the more appropriate definition of casualty, we never-

loss or damage such person, firm or corporation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by *such casualty*. No such contract of insurance shall be cancelled or annulled by any agreement between the insurance company and the assured after the assured has become responsible for such loss or damage, and any such cancellation or annulment shall be void. Upon the recovery of a final judgment against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose and if such judgment is not satisfied within thirty days after the date when it was rendered, such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment." (Emphasis added.)

theless also stated that even under the trial court's more narrow definition of casualty as "an accident; event due to sudden, unexpected, or unusual cause"; (internal quotation marks omitted) id., 366; damage to the net worth of an estate would still qualify as a casualty under the statute. Id., 368.

Thus, our statement, "[a]lthough 'sudden' may also imply quickness, its primary meaning is unexpected"; id.; was made in the context of our articulation of how the loss of value in the estate was a casualty for purposes of the direct action statute. The loss in *Verdon*— the loss of value in the estate—was still a casualty, despite reliance on the use of the word "sudden" to define casualty, because in *that context*, we concluded that sudden did not necessarily require that the loss occur quickly. Id. In *Verdon*, we were faced with an interpretation of casualty in terms of the direct action statute. The language we used in that case to interpret sudden is not controlling in our interpretation of the liability policies at issue in the present case. In fact, in *Verdon*, we specifically limited our interpretation of casualty to its use in § 38-175, now § 38a-321, and suggested that in another context, it might have an alternative meaning. Id.

We are persuaded, further, that an understanding of sudden as a temporally dependent term, which requires that the release occur in a rapid or abrupt manner, makes sense within the larger context of these liability policies. As the New York Court of Appeals noted in analyzing the "sudden and accidental" exception: "[T]he exception exists in the context of an insurance contract which is universally recognized as intended to exclude damage from persistent pollution from the policy's expansive basic coverage of 'occurrence' which includes 'continuous or repeated exposure to conditions.' " *Northville Industries Corp.* v. *National Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 633, 679

N.E.2d 1044, 657 N.Y.S.2d 564 (1997). In other words, a continuous or repeated event that would otherwise qualify for coverage under the policy as an "occurrence," is exempted if the event is a discharge of pollutants. The "sudden and accidental" exception was added, it seems to us, to allow coverage for such discharges, not, as the plaintiff would have it, for unexpected, continuous or repeated events, but if they happen to occur abruptly.

We find it untenable to construe the term "sudden," as the plaintiff would have us, as an event whose only requirement is that it be unexpected to the observer. Other courts agree. "We cannot reasonably call 'sudden' a process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process." *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715, 754, 15 Cal. Rptr. 2d 815 (1993). "Try as I will, I cannot wrench the words 'sudden and accidental' to mean 'gradual and accidental,' which must be done in order to provide coverage in this case." *Dimmitt Chevrolet, Inc.* v. *Southeastern Fidelity Ins. Corp.*, 636 So. 2d 700, 706 (Fla. 1993) (Grimes, J., concurring). "No use of the word 'sudden' . . . could be consistent with an event which happened gradually or over an extended time, nor could it be consistent with an event which was anticipated or predictable." *American Motorists Ins. Co.* v. *General Host Corp.*, 667 F. Sup. 1423, 1428 (D. Kan. 1987), aff'd, 946 F.2d 1482 (10th Cir.), vacated in part and remanded, 946 F.2d 1489 (10th Cir. 1991), on remand, 919 F. Sup. 1506 (D. Kan. 1996). "It seems incongruous . . . to think of a leakage or seepage that occurs over many years as happening suddenly." *Board of Regents of the University of Minnesota* v. *Royal Ins. Co. of America*, 517 N.W.2d 888, 892 (Minn. 1994).

The plaintiff argues, in the alternative, that even if " 'sudden' can be said to *mean* objectively 'quick' or

'abrupt,' it is ambiguous on its face." (Emphasis in original.) The plaintiff suggests, therefore, that we should consult insurance industry drafting history, which, the plaintiff argues, leads to the conclusion that the industry knew that the "sudden and accidental" exception was not intended to restrict coverage to quick or rapidly occurring discharges. Because we find the language in the pollution exclusion to be clear and unambiguous, we find no occasion to refer to this drafting history.

As we previously have stated: "If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply, the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." (Internal quotation marks omitted.) *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 583, 573 A.2d 699 (1990). We note, further, that a "court will not torture words to import ambiguity, where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings." *Downs* v. *National Casualty Co.*, 146 Conn. 490, 494–95, 152 A.2d 316 (1959). "The fact that the parties advocate different meanings of the exclusion clause does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Kelly* v. *Figueiredo*, 223 Conn. 31, 37, 610 A.2d 1296 (1992). "There is no presumption that language in insurance contracts is inherently ambiguous. Only if the language manifests some ambiguity do we apply the rule that ambiguous insurance contracts are to be construed in favor of insureds and to provide coverage." *McGlinchey* v. *Aetna Casualty & Surety Co.*, 224 Conn. 133, 137, 617 A.2d 445

(1992), superseded by statute, *Gohel* v. *Allstate Ins. Co.*, 61 Conn. App. 806, 811–15, 768 A.2d 950 (2001).

We also emphasize that the word "sudden" is not ambiguous simply because the dictionary includes within its definitions of the word, that it may, in certain circumstances, include a sense that the event being described occurred unexpectedly. "[T]he existence of more than one dictionary definition is not the sine qua non of ambiguity. If it were, few words would be unambiguous." *New Castle* v. *Hartford Accident & Indemnity Co.*, 933 F.2d 1162, 1193 (3d Cir.), on remand, 778 F. Sup. 812 (D. Del. 1991). The important question before us is the meaning of the word as used in these policies. We find that this "language is clear and plain, something only a lawyer's ingenuity could make ambiguous." *American Motorists Ins. Co.* v. *General Host Corp.*, supra, 667 F. Sup. 1429. Because we will not create ambiguity where none exists, reference to extrinsic documentation such as drafting history is inappropriate. See *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 781.[17]

Finally, the plaintiff argues that even if we conclude that the word "sudden" is not ambiguous, we should apply the doctrine of regulatory estoppel, as articulated by the Supreme Court of New Jersey in *Morton International, Inc.* v. *General Accident Ins. Co. of America*, 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, 512 U.S. 1245, 114 S. Ct. 2764, 129 L. Ed. 2d 878, rehearing denied, 512 U.S. 1277, 115 S. Ct. 25, 129 L. Ed. 2d 923 (1994).

---

[17] The plaintiff argues that *Heyman Associates No. 1* "does not change the Connecticut rule" that drafting history may be reviewed as an aid in interpreting contract language. See *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 272–73, 439 A.2d 314 (1981). It is true that extrinsic evidence may be introduced to *clarify* the meaning of terms in an integrated contract. Id., 273. Such evidence may not be used, however, once the terms are found to have a clear and unambiguous meaning, as we have found to be the case here. See *Heyman Associates No. 1* v. *Ins. Co. of Pennsylvania*, supra, 231 Conn. 781 n.22.

In *Morton International, Inc.*, the court concluded that the term "sudden" has a temporal meaning, which requires that the event being described begin abruptly or without prior notice or warning. Id., 29. The court, however, found that industry representatives had misled insurance regulators in 1970 into believing that the addition of the pollution exclusion was merely a clarification of, rather than a reduction in, coverage. Id. Rather than enforce the exclusion as written, the court interpreted the policy to provide the same level of coverage as that under prepollution exclusion policies, except that no coverage would be provided for an intentional discharge of pollutants. Id., 78. The court in *Morton International, Inc.*, reached this conclusion, in part, because New Jersey "has long recognized the doctrine that an insurer who misrepresents the coverage of, or the exclusions from, an insurance contract to the insured's detriment may be estopped from denying coverage on a risk not covered by the policy." Id., 74.

We do not agree that regulatory estoppel should apply in the present case. We note that the doctrine has been rejected by several courts that have addressed it since *Morton International, Inc.*[18] In addition, regulatory estoppel appears to be another attempt to examine extrinsic evidence on a term that we already have concluded is clear and unambiguous.

Furthermore, in Connecticut, the doctrine of equitable estoppel, which we deem to be somewhat analogous

[18] See *Federated Mutual Ins. Co.* v. *Botkin Grain Co.*, 64 F.3d 537 (10th Cir. 1995); *Transamerica Ins. Co.* v. *Duro Bag Mfg. Co.*, 50 F.3d 370 (6th Cir. 1995); *Independent Petrochemical Corp.* v. *Aetna Casualty & Surety Co.*, 842 F. Sup. 575 (D.D.C. 1994), aff'd sub nom. *Charter Oil Co.* v. *American Employers' Ins. Co.*, 69 F.3d 1160 (D.C. Cir. 1995); *SnyderGeneral Corp.* v. *Great American Ins. Co.*, supra, 928 F. Sup. 674; *Smith* v. *Hughes Aircraft Co.*, 783 F. Sup. 1222 (D. Ariz. 1991), aff'd in part, 22 F.3d 1432 (9th Cir. 1993); *E.I. du Pont de Nemours & Co.* v. *Allstate Ins. Co.*, 693 A.2d 1059 (Del. 1997); *Farm Bureau Mutual Ins. Co.* v. *Laudick*, 18 Kan. App. 2d 782, 859 P.2d 410, review denied, 253 Kan. 857 (1993); *Anderson* v. *Minnesota Ins. Guaranty Assn.*, 534 N.W.2d 706 (Minn. 1995).

to the plaintiff's argument regarding regulatory estoppel, requires proof of two essential elements: "[First] the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and [second] the other party must change its position in reliance on those facts, thereby incurring some injury." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Voog*, 233 Conn. 352, 366, 659 A.2d 172 (1995).

There is no evidence in this case that, in 1970, insurance regulators *in Connecticut* were misled by industry representations[19] regarding the meaning of the pollution exclusion. In fact, statements by regulators indicate that they understood that the prepollution exclusion policies similarly excluded claims for gradual pollution and that they also understood the term "sudden" to have a temporal meaning.[20] Even if we were to assume that Con-

---

[19] There is also no evidence that the defendants in the present case misled Connecticut regulators.

[20] Waldo DiSanto, former director of rating for the insurance department of the state of Connecticut, and John Kane, former insurance principal examiner for the insurance department, provided affidavits regarding the pollution exclusion. DiSanto stated: "It was my understanding that most gradual pollution was not covered, even before [this exclusion was] introduced. . . . In any event, a rate reduction was not a serious consideration. It is pretty clear that insurers never intended to cover the type of pollution made famous by the Love Canal, and they never charged a premium for it. . . . I do not presently recall when I first read the 'Explanation' that accompanied [the insurance rating board's] filing. Needless to say, I was not misled by that Explanation. . . . Having read it recently, no one should have been misled by that Explanation. It was (and is) my understanding that most gradual pollution was not covered by the occurrence policy because the damage was (or should have been) expected or intended from the insured's standpoint." Kane stated in his affidavit: "In 1970, it was clear to me that 'sudden' meant quick or abrupt, in a temporal sense. 'Sudden' was the opposite of gradual and did not encompass events that occurred over time." Of the insurance rating board's explanation, Kane stated: "There is no question in my mind that the Explanation was not misleading. It made statements that were accurate and used terms whose meanings were commonly understood in 1970 in the regulatory field and by me."

The explanation referred to by DiSanto and Kane was included in a

necticut regulators were misled, and that the plaintiff could produce evidence of this fact, a claim for estoppel would fail because the plaintiff cannot assert as *its* injury any change in position undertaken by insurance regulators purportedly as a result of industry misrepresentations.

In conclusion, we hold that the term "sudden," as used in these policies, requires that the release in question occur in a rapid or otherwise abrupt manner. The release of pollutants over an extended period of time cannot qualify as "sudden" for purposes of the exception to the pollution exclusion in these policies.

II

The plaintiff argues next that, even if the term "sudden" requires that the release of pollutants be abrupt, the trial court improperly granted summary judgment for the defendants because a genuine issue of material fact exists regarding whether any of the releases in this case were "sudden," as we have defined that term. More specifically, the plaintiff urges us to conclude that the trial court improperly disregarded the existence of facts in the record that indicate that the contamination at Highland and at Anchor was caused by the abrupt release of pollutants. We disagree with the plaintiff.

Before addressing the parties' arguments, we set forth the applicable standard of review. "The standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book § 384 [now § 17-49] provides that sum-

---

1970 memorandum circulated to insurance rating board member insurance companies. It provides: "Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The [pollution] exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident . . . ."

mary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Citations omitted; internal quotation marks omitted.) *Doty* v. *Mucci*, 238 Conn. 800, 805–806, 679 A.2d 945 (1996).

We emphasize the important point, that "[a]lthough the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough, however, for the *opposing party* merely *to* assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Internal quotation marks omitted.) *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 202, 663 A.2d 1001 (1995).

The core of this issue is disagreement among the parties concerning who should bear the burden of producing evidence regarding the pollution releases. The plaintiff argues that the defendants, as summary judgment movants, had the burden of showing the absence of a sudden and accidental release at the sites. The

defendants argue that the plaintiff did not produce any relevant evidence that an abrupt release of pollutants occurred at the sites and, therefore, failed to establish a genuine issue of material fact concerning whether there was a "sudden" release of pollutants, as we have defined that term. We agree with the defendants.

In the context of these comprehensive general liability policies, the burden properly rests with the insured to prove that the "sudden and accidental" exception is applicable. In this regard, we agree with the reasoning of the New York Court of Appeals: "Shifting the burden to establish the exception conforms with an insured's general duty to establish coverage where it would otherwise not exist, provides the insured with an incentive to strive for early detection that it is releasing pollutants into the environment and appropriately places the burden of proof on the party having the better and earlier access to the actual facts and circumstances surrounding the discharge . . . ." (Citations omitted.) *Northville Industries Corp.* v. *National Union Fire Ins. Co. of Pittsburgh, Pa.*, supra, 89 N.Y.2d 634. We also note that "when a policy contains an exception within an exception, the insurer need not negative the internal exception; rather, the plaintiff must show that the exception from the exemption from liability applies." 19 G. Couch, Insurance (2d Ed. 1983) § 79:385, p. 338. Other courts similarly have placed this burden on the insured.[21]

---

[21] See *Employers Ins. of Wausau* v. *Petroleum Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995); *Aeroquip Corp.* v. *Aetna Casualty & Surety Co.*, 26 F.3d 893, 895 (9th Cir. 1994); *SnyderGeneral Corp.* v. *Great American Ins. Co.*, supra, 928 F. Sup. 680 n.5; *American Mutual Liability Ins. Co.* v. *Beatrice Cos.*, 924 F. Sup. 861, 878 (N.D. Ill. 1996); *Quaker State Minit-Lube, Inc.* v. *Fireman's Fund Ins. Co.*, 868 F. Sup. 1278, 1312 (D. Utah 1994), aff'd, 52 F.3d 1522 (10th Cir. 1995); *Hudson Ins. Co.* v. *Double D Management Co.*, 768 F. Sup. 1549, 1551 (M.D. Fla. 1991); *Cooper Development Co.* v. *Employers Ins. of Wausau*, 765 F. Sup. 1429, 1431 (N.D. Cal. 1991); *Northern Ins. Co of New York* v. *Aardvark Associates, Inc.*, 743 F. Sup. 379, 381 (W.D. Pa. 1990), aff'd, 942 F.2d 189 (3d Cir. 1991); *A. Johnson & Co.* v. *Aetna Casualty & Surety Co.*, 741 F. Sup. 298, 305 (D. Mass. 1990),

We further agree that "[o]nce an insurer has satisfied its burden of establishing that the underlying complaint alleges damages attributable to the discharge or release of a pollutant into the environment, thereby satisfying the basic requirement for application of the pollution coverage exclusion provision, the burden shifts to the insured to demonstrate a reasonable interpretation of the underlying complaint potentially bringing the claims within the sudden and accidental discharge exception to exclusion of pollution coverage, or to show that extrinsic evidence exists that the discharge was in fact sudden and accidental." *Northville Industries Corp.* v. *National Union Fire Ins. Co. of Pittsburgh, Pa.*, supra, 89 N.Y.2d 634.

In the present case, the defendants met their burden of establishing the initial applicability of the pollution exclusion. First, the plaintiff's revised complaint for declaratory judgment contains allegations that the pollution at Highland and Anchor was related to the release of contaminants during and since 1966. Second, the defendants' respective answers assert that the pollution exclusion contained in the applicable policies effectively deny coverage to the plaintiff.

At that point, the burden shifted to the plaintiff to establish that either allegations in the complaint reasonably could be interpreted as bringing the claim under the sudden and accidental exception, or that extrinsic evidence exists of an abrupt pollution discharge or discharges. The plaintiff's complaint contains no allegations that an abrupt release of pollutants in fact occurred. We turn, therefore, to whether the plaintiff

aff'd, 933 F.2d 66 (1st Cir. 1991); *Fischer & Porter Co.* v. *Liberty Mutual Ins. Co.*, 656 F. Sup. 132, 140 (E.D. Pa. 1986); *E.I. du Pont de Nemours & Co.* v. *Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997); *SCSC Corp.* v. *Allied Mutual Ins. Co.*, 536 N.W.2d 305, 314 (Minn. 1995); *U.S. Industries, Inc.* v. *Ins. Co. of North America*, 110 Ohio App. 3d 361, 366, 674 N.E.2d 414 (1996).

established extrinsic evidence of an abrupt discharge or discharges.

We have examined the extensive documentation submitted by the plaintiff in its opposition to the defendants' motion for summary judgment to ascertain if the plaintiff produced evidence of an abrupt release of pollutants at the Highland and Anchor sites. We conclude that the trial court correctly determined that the evidence presented by the plaintiff in opposition to the defendants' motion for summary judgment does not establish the existence of a genuine issue of material fact as to whether the discharges were "sudden," as we have defined that term.

## A

### The Highland Site

On appeal, the plaintiff argues that the contamination at Highland could have been the result of an abrupt release of TCE caused by a malfunction in the degreasing machine. The plaintiff asserts that this type of malfunction "would result in a large release of TCE to the lagoon equivalent to punching a hole in the degreaser and allowing 500 gallons of TCE to pour out." We can find no evidence submitted by the plaintiff to suggest that an event like this had occurred. The plaintiff's conclusion rests, we conclude, on faulty logic. Rather than present evidence that such an abrupt release had occurred, the plaintiff cited evidence to show that Highland's normal operating procedures would not result in the release of TCE to the lagoon. In other words, the plaintiff believes that it has established the fact of a separator malfunction—an abrupt release—by showing the absence of any other means by which TCE could have leaked to the lagoon.[22]

---

[22] The trial court had similar difficulty in accepting this logic. At the hearing on the summary judgment motion, the following colloquy occurred between the judge and the plaintiff's attorney regarding evidence of an abrupt release at Highland:

"The Court: . . . I have asked for additional oral argument on the question of assuming that I get to the factual issue question, and I am referring to, [John] Vishneski [plaintiff's counsel], your brief in opposition on the pollution exclusion, and specifically at page 3 of that brief. The glob of TCE is where I am looking. . . . There is no citation with it . . . and I have looked with no result to find anything, and so rather than continue to look through nine boxes of stuff, it seemed like the prudent course of action to require you to direct us where, if anywhere, in the affidavits and other appropriate submissions I am going to find the factual predicate for this statement [that the TCE discharge may have occurred on one occasion lasting only a few hours].

"[Plaintiff's Counsel]: Your Honor, you are absolutely right. And it was—when we got the message that you wanted to talk about that, I went back and looked at [the] briefs to see what it was that was probably troubling you.

\* \* \*

"The Court: Where is the testimony that quantifies the amount of TCE in the bottom of the lagoon and says how long it would have taken to accumulate?

"[Plaintiff's Counsel]: From just what you have heard, if you have nothing else, you can make the following inference. If TCE instead of water is flowing out of that top pipe at three gallons per minute—

"The Court: Pure TCE?

"[Plaintiff's Counsel]: Yes. If you clogged the separator of pipe that typically takes the TCE back—

"The Court: Yes.

"[Plaintiff's Counsel]: —instead of flowing at three gallons per minute back to the TCE, the degreaser tank, it is going to be flowing out the water pipe at that rate. . . .

"The Court: Is there any evidence at any point they lost four hundred gallons of TCE?

"[Plaintiff's Counsel]: What is the evidence, Your Honor? Witness after witness has testified as to how this degreaser operated and—

"The Court: Right.

"[Plaintiff's Counsel]: And there is no evidence that there was any practice, any way that TCE could get out of the degreaser through a practice.

"The Court: Okay. Go ahead.

"[Plaintiff's Counsel]: The inference is—we don't have direct testimony of somebody saying I watched the level go down, we just don't have that.

\* \* \*

"The Court: You had the ability to put an affidavit in.

"[Plaintiff's Counsel]: I understand.

"The Court: From an expert who said if he could do that under oath, who said in my opinion the presence of TCE at Highland happened in the following manner and over the following time frame. I am assuming that that testimony doesn't exist, but you still—I suppose you could have had an affidavit about inference. That would be a nice question as to whether that raised a material fact, a material issue of fact. But that is not, I don't have that."

We are not convinced. As the extensive documentation submitted to this court confirms, the nature of this contamination is a highly complex matter. We cannot agree that the several ways the plaintiff acted to contain its use of TCE combined with the fact that TCE now exists in the groundwater at Highland, results in the conclusion that there must have been a separator malfunction.[23] The plaintiff had the burden to establish the existence of facts purporting to show an abrupt release of pollutants and failed to carry this burden. The trial court correctly determined that no genuine issue of material fact existed regarding a sudden release of pollutants at Highland.

B

The Anchor Site

We conclude that the trial court properly determined that no genuine issue of material fact exists regarding a sudden release of pollutants at Anchor. The plaintiff claims that an oil spill in 1971 "explains the source of the TPH" in the loading dock area at the Anchor facility. As evidence for this claim, the plaintiff cites to documentation from an Anchor safety committee meeting on September 16, 1971. The record of the meeting refers to an oil spill at the Anchor facility: "Back yard lot— Oil spill from tank truck parked—creating hazardous condition—this being corrected through construction." In the October 28, 1971 safety committee minutes, there is another reference to the spill: "Cement pads installed to correct oil spill from tank truck. *Corrected.*" (Emphasis in original.) The spill may have been the result of

---

[23] The plaintiff also cited deposition testimony from the defendants' expert, David Bauer, in which he described the ways that a separator could malfunction. We disagree with the plaintiff's assertion that Bauer "testified that a separator malfunction in Highland's degreaser is the most probable cause of TCE loss." Bauer was merely listing the ways that degreasers could fail, in general, and was not attempting to articulate the actual cause of TCE contamination at Highland.

a hose break from a truck that was pumping waste oil out from the tank. The plaintiff argues that this evidence sufficiently places a material fact at issue regarding whether a sudden release of pollutants occurred at Anchor. We disagree.

It is undisputed that an oil spill occurred at the Anchor facility in 1971. We agree with the trial court that this event, however, does not create a genuine issue of material fact so as to prevent summary judgment for the defendants. The important question before us is not whether an oil spill occurred, but whether the evidence of such a spill properly places at issue a material fact regarding whether this spill constitutes a sudden event likely to have contributed to the environmental contamination at Anchor. We conclude that it does not.

"[T]he 'genuine issue' aspect of summary judgment requires the parties to bring forward before trial evidentiary facts, or substantial evidence outside the pleadings, from which the material facts alleged in the pleadings can warrantably be inferred." *United Oil Co.* v. *Urban Redevelopment Commission*, 158 Conn. 364, 378–79, 260 A.2d 596 (1969). "A material fact has been defined adequately and simply as a fact which will make a difference in the result of the case." (Internal quotation marks omitted.) *Hammer* v. *Lumberman's Mutual Casualty Co.*, supra, 214 Conn. 578. The plaintiff submitted no evidence regarding the size of the 1971 oil spill, the duration of the event or the specific impact that this spill had on the state of contamination at Anchor. According to the defendants' expert, the 1971 oil spill "resulted in at most, 'de minimus' environmental contamination and did not substantially contribute to the well-documented environmental degradation at the Anchor . . . [site]. The environmental contamination that has been documented at the . . . Anchor [site] resulted from the hazardous waste handling and dis-

posal practices over a course of many years during the ordinary course of business operations."

The plaintiff submitted an affidavit from its own expert, B. Tod Delaney, wherein he stated: "Remediation, specifically the removal of the plating room floor and the excavation of metals-contaminated soils was required at the Anchor facility to address the former plating area. In addition, petroleum-contaminated soil resulting from an oil spill in the loading dock area was remediated. Incidental spills as a result of day-to-day operations did not drive these required remediation activities." The plaintiff submits that this statement creates a genuine issue of material fact regarding whether an abrupt release of pollutants occurred at the Anchor facility. We disagree.

This conclusory statement does not put a material fact at issue regarding an abrupt release at Anchor. "Although an affidavit by an expert may be considered in opposition to a motion for summary judgment, conclusory affidavits, even from expert witnesses, do not provide a basis on which to deny such motions. 27A Fed. Proc., L. Ed. § 62:717 (1996)." *Morales* v. *Kagel*, 58 Conn. App. 776, 781, 755 A.2d 915 (2000). Delaney's statement that "petroleum-contaminated soil resulting from an oil spill in the loading dock area was remediated" provides only a conclusion: that, in Delaney's opinion, the soil was contaminated as a result of the oil spill. What is missing, however, are salient facts linking the 1971 oil spill to the petroleum contamination in this area of the Anchor facility. It is insufficient to merely cite the historical fact of a spill and the present state of contamination, and provide no facts linking the two. Because, as we established earlier in this opinion, the plaintiff properly had the burden to establish the existence of these facts, it cannot avoid summary judgment for the defendants by the mere assertion of a

conclusion regarding the cause of the contamination at Anchor.

Despite the plaintiff's claim that its Anchor consultant, W. Terry Robinson, "testified that the source of the TPH . . . may have been oil spilled at one time along the loading dock wall," our review of this testimony reveals merely speculation regarding the source of the contamination and does not link the 1971 spill to the recent existence of TPH at Anchor. In fact, Robinson admitted, in his deposition, that his theory regarding the contamination being caused by an oil spill was speculative.[24]

We acknowledge that "[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." (Internal quotation marks omitted.) *Matsushita Electric Industrial Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538, on remand sub nom. *In re Japanese Electronic Products Antitrust Litigation*, 807 F.2d 44 (3d Cir. 1986). A party may not, however, "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570, 94 L. Ed. 2d 762 (1987). The evidence of the 1971 oil spill requires that we engage in speculation as to the connection between this event and the contamination at Anchor. We decline to join in this endeavor and conclude that the plaintiff has failed to demonstrate that the 1971 oil spill serves

---

[24] Robinson stated in his deposition: "I mean, one of the things that we *speculated* in our letters to [the department] was that the materials beneath the loading dock are typically gravels, more permeable for *perhaps* a preferential path for oil that had *perhaps* been leaked or released at one time along the loading dock wall to travel to." (Emphasis added.)

to create a genuine issue of material fact regarding an abrupt release at Anchor.[25]

A remand to the trial court for further findings on this issue would serve no substantive purpose, for we can assume that if additional information exists regarding this oil spill, the parties would have discovered it and cited it to the trial court during the proceedings on the motion for summary judgment. We cannot conclude that a jury reasonably could find that the fact of this 1971 oil spill, without more, would be sufficient to implicate coverage under the defendants' comprehensive general liability policies.

We conclude, therefore, that the trial court properly granted the defendants' motion for summary judgment since no genuine issues of material fact exist regarding whether sudden releases of pollutants occurred at the Highland and Anchor facilities.

[25] The safety committee's reaction to the oil spill, as reported in the September 16, 1971 minutes, leads us to conclude that the committee was not particularly concerned with the spill. The language used by the committee to describe the event does not indicate that the spill created a grave condition at the facility. The spill was one of twenty-four items discussed at a meeting that lasted only one hour and five minutes. Discussion of the oil spill came after highlight of noise problems at the plant and before a suggestion was offered to name a new member to the safety committee. No other mention was made of the spill until nearly six weeks later, when the safety committee met again and concluded that the spill had been "[c]orrected."

The plaintiff asserted in its response brief to the defendants' motion for summary judgment, that the oil spill resulted in a "significant release." We find no factual data to support this conclusion. A member of the safety committee, John Orsini, was contacted by the environmental consultants retained by the plaintiff. Orsini, though not deposed himself, was reported to have described the spill as creating a "mess." We cannot conclude, however, that this hearsay description of the spill area serves to substantiate a conclusion that a "significant release" had occurred.

We are guided by similar treatment of an isolated spill by the court in *Edo Corp.* v. *Newark Ins. Co.*, 878 F. Sup. 366 (D. Conn. 1995). There, the trial court granted summary judgment for the defendant insurers, despite the plaintiff's assertion that a drum of TCE had been damaged and had released its contents, because no evidence existed that this spill contributed to the contamination at the site. Id., 375 n.6.

## III

The plaintiff's final claim is that the personal injury provisions of the defendants' policies entitle it to coverage for these environmental claims and, therefore, the trial court improperly granted summary judgment for the defendants on this issue. More specifically, the plaintiff argues that the environmental contamination constitutes " 'wrongful entry or eviction, or other invasion of the right of private occupancy' " and is therefore properly within the scope of the personal injury provisions of these policies. In other words, the plaintiff asserts that the groundwater pollution that has migrated to adjacent properties, has subjected the plaintiff to potential claims charging it with " 'wrongful entry or eviction, or other invasion of the right of private occupancy.' " We conclude that the trial court properly determined that the personal injury provisions of these policies do not provide coverage for these claims.[26]

The comprehensive general liability policies in this case provide coverage for personal injury as well as property damage. Personal injury is defined in the Federal policy, effective 1975, to mean: "1. [B]odily injury or; 2. injury sustained by any person or organization arising out of the commission, during the policy period and within the territorial limits, of one or more of the following offenses: a. false arrest, detention or imprisonment, or malicious prosecution; b. the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; or c.

---

[26] We note that, unlike the pollution exclusion clause, the parties agree that no factual disputes exist regarding this issue and it therefore presents a pure question of law for the court's determination.

*wrongful entry or eviction, or other invasion of the right of private occupancy.*"[27] (Emphasis added.)

We do not agree that the personal injury provisions of these policies were meant to cover damages for pollution related claims. As we already have indicated, the policies unequivocally eliminate from coverage property damage that is the result of the release of pollutants, unless such release is sudden and accidental. We can discern no reasonable rationale for excluding from coverage such a claim under the property damage's pollution exclusion, but permitting an insured to proceed under the personal injury provisions in order to lay claim to reimbursement. "[I]t is hardly a fair reading of the policy to permit property and environmental claims, under the guise of personal injury, where the pollution exclusion clearly protects the insurer from precisely such claims." (Internal quotation marks omitted.) *Lakeside Non-Ferrous Metals, Inc.* v. *Hanover Ins. Co.*, 172 F.3d 702, 705 (9th Cir. 1999). Allowing the plaintiff "to recast its claim under the personal injury provision would render . . . the pollution exclusion a dead appendage to the policy." Id., 706. The policies clearly were intended to exclude costs for pollution related claims, unless sudden and accidental, and we will not

---

[27] The 1977 Federal policy eliminates the phrase "bodily injury" from the definition of personal injury, but is otherwise substantially the same. The Chicago policies define personal injury to mean: "(a) bodily injury, shock, disability, sickness or disease (including death, and care and loss of services, mental anguish and mental injury resulting therefrom); (b) injury arising out of false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution; or (c) injury arising out of racial or religious discrimination not committed by or at the direction of the named insured or any executive officer, director, stockholder or partner thereof, but only with respect to liability other than fines, penalties or liquidated damages imposed by law; or (d) injury arising out of libel, slander, defamation of character, humiliation or invasion of the right of privacy, unless such injury arises out of advertising activities."

In the Chicago policies, the pollution exclusion is applicable to both personal injury and property damage claims. The pollution exclusion in the Federal policies applies to bodily injury and property damage.

stretch the personal injury provisions to cover a claim that another area of the policy clearly excludes.[28]

We also conclude that the personal injury provisions were intended to reach only intentional acts by the insured, which obviously would not include the pollution at issue in this case. We agree with the New York Court of Appeals' interpretation of the personal injury provision: "[C]overage under the personal injury endorsement provision in question was intended to reach only *purposeful acts* undertaken by the insured or its agents. Evidence that only purposeful acts were to fall within the purview of the personal injury endorsement is provided, in part, by examining the types of torts enumerated in the endorsement in addition to wrongful entry, eviction and invasion: false arrest, detention, imprisonment, malicious prosecution, defamation and invasion of privacy by publication. Read in the context of these other enumerated torts, the provision here could not have been intended to cover the kind of indirect and incremental harm that results to property interests from pollution." (Emphasis added.) *Columbia* v. *Continental Ins. Co.*, 83 N.Y.2d 618, 627–28, 634 N.E.2d 946, 612 N.Y.S.2d 345 (1994).

---

[28] The plaintiff highlights the fact that, in the Federal policy, the pollution exclusion is not made explicitly applicable to the personal injury provisions. The Ninth Circuit Court of Appeals, in an unpublished opinion, answered this problem: " 'The fact that [c]overage . . . for "personal injury" does not contain its own pollution exclusion clause merely points out that the insurance company never contemplated (justifiably) that [personal injury coverage] might be interpreted to cover pollution damages to land, given the context of the whole policy.' " *W.H. Breshears, Inc.* v. *Federated Mutual Ins. Co.*, United States Court of Appeals, Docket No. 93-15252 (9th Cir. October 17, 1994); see *Harrow Products, Inc.* v. *Liberty Mutual Ins. Co.*, 64 F.3d 1015 (6th Cir. 1995). We could entertain speculation as to why Chicago decided to include, in its pollution exclusion clause, reference to "personal injury," while Federal did not. We cannot, however, reasonably assume from this fact that Federal intended to include coverage for these pollution related claims under its personal injury provisions.

For the foregoing reasons, we conclude that the trial court correctly granted summary judgment for the defendants on the personal injury issue.

The judgment is affirmed.

In this opinion the other justices concurred.

