******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

APPENDIX

DREY ANDRADE *v.* LEGO SYSTEMS, INC.*

Superior Court, Judicial District of Hartford
File No. CV-14-6053523-S

Memorandum filed January 26, 2018

*Proceedings*

Memorandum of decision on defendant's motion for summary judgment. *Motion granted.*

*James V. Sabatini*, for the plaintiff.

*Victoria Woodin Chavey*, for the defendant.

*Opinion*

BRIGHT, J.

## I

## INTRODUCTION

This action arises out of the defendant's, Lego Systems, Inc. (Lego), termination of the plaintiff's, Drey Andrade, employment. The plaintiff alleges in the sole count of his complaint that he was terminated based on discrimination against him due to his sexual orientation in violation of General Statutes § 46a-60 (a) (1). The defendant has moved for summary judgment, claiming that there are no genuine issues of material fact that: (1) the person who made the termination decision did not know of the plaintiff's sexual orientation; and (2) the plaintiff was terminated for reasons wholly unrelated to his sexual orientation. The plaintiff argues that he has produced sufficient evidence from which a reasonable jury could infer that the plaintiff's termination was based on his sexual orientation. For the reasons set forth more fully below, the defendant's motion is granted.

## II

## FACTS

The evidence submitted, viewed in a light most favorable to the plaintiff, establishes the following facts. The plaintiff began working for the defendant on or about October 12, 2009, as Distribution Operations Manager CED. In that role, he reported to Julie Bianchi, Director of Distribution, Americas. The plaintiff is homosexual. Approximately six months after the plaintiff began working for the defendant, the plaintiff and Bianchi were having a conversation about their pets. The plaintiff had several dogs, and Bianchi asked him who took care of his animals. The plaintiff responded that his partner does at home. The plaintiff did not identify the sex of his partner and never told Bianchi that he was gay. The plaintiff did not recall any reaction by Bianchi to his comment. At no other point during his employment with the defendant did the plaintiff ever discuss his sexual orientation with Bianchi. Nor is there any evidence that Bianchi learned the plaintiff's sexual orientation from any other source. The plaintiff never heard Bianchi refer to him as being gay and never heard Bianchi make any derogatory statements or jokes about gay people.

On September 23, 2010, Bianchi placed the plaintiff on a performance plan. The plan required the plaintiff to take specific actions over a period of ninety days. It provided that if the plaintiff failed to meet the requirements of the plan, additional actions would be taken, including the possibility of termination. The plan was detailed in a memo from Bianchi to the plaintiff. The memo set forth Bianchi's concern about the plaintiff's

unavailability on site and his lack of responsiveness. Furthermore, while Bianchi stated her belief that the plaintiff had the hard skills necessary to be a strong performer, she stated that the plaintiff had not demonstrated the necessary competencies around communication, collaboration, and building trust. Both Bianchi and the plaintiff signed the plan. There is no evidence that the plaintiff ever disputed the specific issues raised by Bianchi in the plan. There is also no evidence that the plaintiff did not comply with the ninety day plan. Nor is there any evidence that any further disciplinary actions were taken against the plaintiff as a result of the plan.

In the plaintiff's midyear review for 2011, Bianchi noted further concerns she had about the plaintiff's performance. She rated his performance as "Medium/ Low." The review noted that the plaintiff is talented and capable in both operation and transportation. The review provided specific examples of where the plaintiff had performed well in these areas. Nevertheless, Bianchi noted that the plaintiff was not meeting expectations in developing employees who reported to him. The review further noted that Bianchi had discussed with the plaintiff moving to a role that focused on his operational strengths but would remove him from managing other employees. The plaintiff was not interested in such a move. Instead, he acknowledged to Bianchi that he needed to work on and improve his employee management skills. The review concluded by Bianchi, noting: "I very much want to see you succeed Drey, and will support you in this effort." There is no evidence that the plaintiff in any way disputed the issues raised by Bianchi or her overall assessment of his performance.

The plaintiff's 2012 midyear review prepared by Bianchi reflects her conclusion that the plaintiff had addressed the area of people development and was now meeting expectations. Nevertheless, the review noted two other areas where the plaintiff was performing below expectations. First, Bianchi noted that the plaintiff needed to do better to understand the retail side of the defendant's business. Second, Bianchi noted that the plaintiff needed to focus on collaboration. In particular, Bianchi stated that she found the plaintiff's collaboration with her not acceptable and that his behavior resulted in a lack of trust. Bianchi provided specific examples of a lack of communication and coordination from the plaintiff to her. Again, there is no evidence that the plaintiff disputed the issues raised by Bianchi.

The concerns raised by Bianchi at the midyear review were not addressed to her satisfaction because Bianchi placed the plaintiff on a second performance plan on October 26, 2012. The specific reason given for the performance plan was the plaintiff's failure to achieve target performance level in collaboration and strategic orientation. The plan provided nine detailed examples

between February and September, 2012, of what Bianchi viewed as a lack of collaboration between the plaintiff and either her, other Lego employees or third parties with whom the plaintiff dealt. Almost all of the examples centered on Bianchi's perception that the plaintiff was not communicating appropriately with others. The plan set forth specific actions the plaintiff was expected to take over the next sixty days. The plan noted that if the plaintiff failed to meet the expectations of the plan, further disciplinary action, including termination, could be taken. It concluded by stating: "By signing this document, you are agreeing to execute on the details of the plan outlined above and that you understand the performance plan as presented to you." The plaintiff signed the plan and handwrote next to his signature: "I will provide written feedback on items addressed by 11/2/12." There is no evidence that he ever provided such feedback or otherwise disputed the issues raised by Bianchi in the plan.

On January 31, 2013, the performance plan was extended until March 15, 2013, because the plaintiff had met some, but not all, of the expectations of the plan. Bianchi also identified further specific examples of the plaintiff's performance shortcomings. She further provided specific expectations to be met by the plaintiff by March 15, 2013. The plaintiff signed the extension of the plan. Again, he has provided no evidence that he in any way disputed any of the issues raised by Bianchi.

On March 6, 2013, the plaintiff and Bianchi met to discuss the plaintiff's response to the performance plan. The plaintiff had submitted a response on February 28, 2013. Bianchi's memo from the meeting reflects that she had already recommended that the plaintiff's employment be terminated because he had not met the expectations of the October 26, 2012 plan. It also reflects that Bianchi was concerned that the plaintiff's February 28, 2013 response was focused on his team's past successes and not on addressing the areas of concern identified in the performance plan. Bianchi also discussed with the plaintiff his PMP and KPI scores, which are mathematical metrics the defendant uses to measure employee performance. Bianchi acknowledged that the plaintiff had a very high PMP score. She also acknowledged that he scored well on his KPIs. She explained to the plaintiff, though, that PMP and KPI scores are based on operational metrics, and did not address the collaboration and strategic orientation issues that were the bases for the performance plan. She also told the plaintiff her belief that his performance scores would be negatively impacted if he did not address the issues identified in the performance plan. Bianchi told the plaintiff that she needed more time to review his submittal, and they scheduled a follow-up meeting for March 15, 2013.

On March 21, 2013, the October 26, 2012 performance

plan was extended for a second time. The extension noted that the plaintiff first responded to the deliverables requested in the January 31, 2013 extension in his February 28, 2013 response. The March 21, 2013 extension detailed eight specific reasons why the plaintiff's February 28, 2013 submittal did not meet Bianchi's expectations. In particular, Bianchi noted that the plaintiff's response was focused on what had happened in the past and did not address how things would be improved going forward. Furthermore, Bianchi noted the plaintiff's failure to submit a complete transportation strategy and a distribution recall process, both of which were overdue. She also noted continuing communication issues, including a failure to respond properly and timely to multiple customer logistics requests. The plaintiff was given specific expectations that he was required to meet by May 3, 2013. The plaintiff signed the performance plan extension. He has submitted no evidence that he ever disputed the specific issues raised by Bianchi in that document. The defendant terminated the plaintiff on May 9, 2013. The defendant hired an individual to replace the plaintiff. The defendant does not know this individual's sexual orientation.

The plaintiff testified, and the court accepts as true for purposes of the defendant's motion, that he was not permitted to attend a number of conferences, including the Global Transportation Forum, the company-wide sales conference, a strategy meeting with PFSweb, a third-party vendor the plaintiff was responsible to manage, and a meeting in Canada to discuss the Canadian distribution market. The plaintiff testified that other similarly situated managers who were not gay were permitted to go to these meetings. The plaintiff further testified that excluding the plaintiff from these meetings allowed Bianchi to criticize the plaintiff's performance in the areas of strategic orientation, collaboration and communication. At the same time, the plaintiff acknowledged that he attended monthly meetings with PFSweb at its offices in Memphis, Tennessee. The plaintiff also attended meetings with a vendor in Pennsylvania, Minnesota, Kansas and Florida, attended a global conference in Prague, and visited the defendant's global headquarters in Billund, Denmark. Additional facts will be discussed as necessary.

### III

### DISCUSSION

The summary judgment standard is well established. "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Stuart* v. *Freiberg*, 316 Conn. 809, 820, 116 A.3d 1195 (2015). "[T]he genuine issue aspect of summary judgment requires the parties

to bring forward before trial evidentiary facts, or substantial evidence outside the pleadings, from which the material facts alleged in the pleadings can warrantably be inferred. . . . A material fact has been defined adequately and simply as a fact which will make a difference in the result of the case." (Citation omitted; internal quotation marks omitted.) *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 556, 791 A.2d 489 (2002). "[T]he burden of showing the nonexistence of any material fact is on the party seeking summary judgment." (Internal quotation marks omitted.) *Tuccio Development, Inc.* v. *Neumann*, 114 Conn. App. 123, 126, 968 A.2d 956 (2009). "To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue." (Internal quotation marks omitted.) *Ferri* v. *Powell-Ferri*, 317 Conn. 223, 228, 116 A.3d 297 (2015).

"[T]ypically, [d]emonstrating a genuine issue requires a showing of evidentiary facts or substantial evidence outside the pleadings from which material facts alleged in the pleadings can be warrantably inferred. . . . Moreover, [t]o establish the existence of a material fact, it is not enough for the party opposing summary judgment merely to assert the existence of a disputed issue. . . . Such assertions are insufficient regardless of whether they are contained in a complaint or a brief. . . . Further, unadmitted allegations in the pleadings do not constitute proof of the existence of a genuine issue as to any material fact. . . .

"Although the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion . . . a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary, judgment. . . . Only evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment. . . . Requiring the nonmovant to produce such evidence does not shift the burden of proof. Rather, it ensures that the nonmovant has not raised a specious issue for the sole purpose of forcing the case to trial." (Citations omitted; internal quotation marks omitted.) *Walker* v. *Dept. of Children & Families*, 146 Conn. App. 863, 870–71, 80 A.3d 94 (2013), cert. denied, 311 Conn. 917, 85 A.3d 653 (2014).

The plaintiff's sole claim is that his termination was the result of illegal discrimination by Bianchi because the plaintiff is gay. The shifting burdens of proof for establishing such a claim are well settled. "When a plaintiff claims disparate treatment under a facially neutral employment policy, this court employs the burden-shifting analysis set out by the United States Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[1] Under this analysis, the employee must first make a prima facie case of discrimination. The employer may then rebut the prima facie case by stating a legitimate, nondiscriminatory justification for the employment decision in question. The employee then must demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias. . . .

"The burden of establishing a prima facie case [of discrimination] is a burden of production, not a burden of proof, and therefore involves no credibility assessment by the fact finder. . . . The level of proof required to establish a prima facie case is minimal and need not reach the level required to support a jury verdict in the plaintiff's favor. . . . To establish a prima facie case of discrimination in the employment context, the plaintiff must present evidence that: (1) [he] belongs to a protected class; (2) [he] was subject to an adverse employment action; and (3) the adverse action took place under circumstances permitting an inference of discrimination. . . . To establish the third prong, a litigant may present circumstantial evidence from which an inference may be drawn that similarly situated individuals were treated more favorably than [he] was. . . . To be probative, this evidence must establish that the plaintiff and the individuals to whom [he] seeks to compare [himself] were similarly situated in all material respects . . . . [A]n employee offered for comparison will be deemed to be similarly situated in all material respects if (1) . . . the plaintiff and those [he] maintains were similarly situated were subject to the same workplace standards and (2) . . . the conduct for which the employer imposed discipline was of comparable seriousness." (Citations omitted; emphasis omitted; footnote added; internal quotation marks omitted.) *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 513–14, 43 A.3d 69 (2012). "Moreover, as discrimination will seldom manifest itself overtly, courts must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law. . . . However, they must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. This undertaking is not one of guesswork or theorization. After all, [a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that

a disputed fact exists on the basis of another fact [that is known to exist]. . . . Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances. As a jury would be entitled to review the evidence as a whole, courts must not view the evidence in piecemeal fashion in determining whether there is a trial-worthy issue." (Citations omitted; internal quotation marks omitted.) *Bickerstaff* v. *Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999), cert. denied, 530 U.S. 1242, 120 S. Ct. 2688, 147 L. Ed. 2d 960 (2000).

The evidence, viewed in a light most favorable to the plaintiff, establishes that he is a member of a protected class and was subject to an adverse employment action. The question is whether the plaintiff has presented sufficient evidence that he was terminated under circumstances that give rise to an inference of discrimination. The defendant argues that such an inference is impossible because the person responsible for terminating the plaintiff, Bianchi, did not know that the plaintiff was gay. Bianchi testified in her affidavit that (1) she never knew that the plaintiff was gay; (2) neither the plaintiff nor anyone else told her he was gay; and (3) the plaintiff never did or said anything that led her to believe he was gay.

In response, the plaintiff does not claim that he ever told Bianchi that he was gay. Nor does he claim that anyone else told her that he was gay. Nor does he claim that he ever heard Bianchi refer to him as gay. The plaintiff's claim that Bianchi knew of his sexual orientation is based entirely on his testimony that he once told Bianchi that his partner stayed at home with his dogs. He did not tell Bianchi the name or sex of his partner and she did not ask. From this one statement the plaintiff argues that a reasonable jury could infer that Bianchi would understand the plaintiff's reference to his partner to mean his "gay partner." The defendant argues that such a conclusion is not a reasonable inference from the evidence, but instead impermissible speculation.

The court agrees with the defendant. The reference to his partner could have several meanings, including his unmarried heterosexual partner. For a jury to conclude from this single comment that Bianchi knew that the plaintiff was gay would require it to speculate or guess that Bianchi took meaning from words that did not express this meaning. Such speculation is particularly troubling here when the plaintiff admits that there is absolutely no other evidence to support the inference the plaintiff suggests. The plaintiff has not offered the testimony of a former coworker or anyone else to suggest that there was reason beyond the plaintiff's single cryptic statement to believe that Bianchi knew that the plaintiff was gay.

In addition, even assuming that Bianchi knew of the plaintiff's sexual orientation, the circumstances sur-

rounding his termination do not permit an inference of discrimination by a reasonable jury. First, while the plaintiff claims that he was not given the same opportunity to attend conferences and meetings that were given to similarly situated heterosexual male colleagues, the evidence he has submitted fails to establish that those other employees were in fact similarly situated. "[W]hether two employees are similarly situated ordinarily presents a question of fact . . . . [However], a court can properly grant summary judgment [on a discrimination claim] where it is clear that no reasonable [fact finder] could find the similarly situated prong met." (Emphasis omitted; internal quotation marks omitted.) *Walker* v. *Dept. of Children & Families*, supra, 146 Conn. App. 876 n.11. There is no evidence that any of those employees were ever the subject of a performance plan. Nor is there any evidence that Bianchi or any other supervisor had even one performance issue with those employees. By contrast, the undisputed evidence establishes that Bianchi set forth in writing detailed concerns with the plaintiff's job performance. The plaintiff received each of these writings and signed each of the performance plans that set forth Bianchi's issues. There is no evidence that the plaintiff ever disputed any of the issues raised by Bianchi. In fact, the plaintiff has not submitted a single performance related document in opposition to the defendant's motion. No reasonable jury could find that the plaintiff has proved that similarly situated employees were treated differently when he has failed to show that any of the employees were in fact similarly situated. Without knowing whether any of those employees ever did anything that might subject them to discipline makes it impossible for a reasonable jury to address whether the termination of the plaintiff for his undisputed underperformance was motivated by bias against his sexual orientation.

In response, the plaintiff appears to argue that any shortcoming in his performance was due to Bianchi's decision to exclude him from certain conferences and meetings. The undisputed evidence would not permit a reasonable jury to draw such an inference. Most of the issues raised by Bianchi related to the plaintiff's communication with her and others both inside and outside Lego. In addition, Bianchi raised concerns with the plaintiff's failure to timely complete projects and follow through on various commitments he made. No reasonable jury could conclude that such failures would not have occurred had the plaintiff been permitted to attend various conference and meetings. Furthermore, the plaintiff has provided nothing but his own conclusory statements as to the relationship between these conferences and meetings and his job performance. He has provided no documentation or other evidence regarding what occurred at these conferences and how it related to his job duties, and specifically to the issues raised by Bianchi. Finally, because the plaintiff has pre-

sented no evidence as to the level of job performance of the purportedly similarly situated heterosexual employees, there is no factual basis for a jury to conclude that any of those employees should have been denied permission to go to those conferences and meetings due to performance issues like those documented with the plaintiff.

The plaintiff also argues that his high PMP and KPI scores belie any problems with his job performance. This argument ignores, though, that the issues raised by Bianchi were unrelated to the metrics measured by those scores. It also ignores that the only evidence presented to the court regarding the KPI score is that it also measures team or regional performance, and global performance, with a trend toward heavier emphasis on global company performance. Consequently, according to Bianchi, a high KPI score might not indicate strong job performance by the individual employee. The plaintiff has offered no evidence to the contrary. Finally, the plaintiff has not provided the court with the actual PMP or KPI scores for him or the purported similarly situated employees. Consequently, the court is in no position to evaluate the significance of these scores in how the plaintiff or any other employee was treated by the defendant.

Despite these issues, the plaintiff argues that the court may not grant summary judgment when the employer's action is based solely on the subjective evaluation of the employee because such subjectivity may mask discrimination. The plaintiff erroneously equates subjectivity with a lack of objectively measured numerical data supporting the employment action. That has never been the case. When courts talk about unreliable subjective reasons they are referring to actions taken with little or no reason given for them other than the subjective preference of the employer. "Accordingly, an 'employer's explanation of its reasons must be clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.' *Meiri* v. *Dacon*, 759 F.2d 989, 996–97 [2d Cir.] [cert. denied, 474 U.S. 829, 106 S. Ct. 91, 88 L. Ed. 2d 74 (1985)]. Where an employer's explanation, offered in clear and specific terms, 'is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn.' *Lieberman* v. *Gant*, 630 F.2d 60, 67 (2d Cir. 1980)." *Kahn* v. *Fairfield University*, 357 F. Supp. 2d 496, 504 (D. Conn. 2005). Here, Bianchi repeatedly set forth in clear and specific terms the issues with the plaintiff s job performance. As noted above, the plaintiff has submitted no evidence to dispute the issues raised by Bianchi. Given these undisputed facts, there is simply no basis to draw an inference of discrimination.

Finally, no reasonable jury could draw an inference of discrimination given the manner in which Bianchi

handled the plaintiff's job performance issues. The plaintiff claims that Bianchi learned of his sexual orientation sometime in the spring or summer of 2010, approximately six months after he started working for the defendant. Yet, he was not terminated until three years later, in May, 2013. During that three year period it is undisputed that Bianchi gave the plaintiff repeated warnings about his inadequate job performance. She provided the plaintiff with specific examples of deficient performance and gave him an opportunity to address them. Bianchi also provided the plaintiff with encouragement, and praised him for his positive attributes. She also offered the plaintiff an opportunity to transition to another position that seemed to be a better fit for his skills. The defendant twice extended the October 26, 2012 performance plan to give the plaintiff additional time to comply with its terms. Based upon the undisputed evidence submitted by the defendant, no reasonable jury could conclude that sometime in 2010 Bianchi embarked on a three year plan of both criticizing and praising the plaintiff, and offering him other career paths, with the ultimate goal of terminating him.

For all of the foregoing reasons there is simply insufficient evidence from which a reasonable jury could conclude that the circumstances surrounding the plaintiff's termination could give rise to an inference of discrimination. The defendant produced considerable evidence that belies any such inference. The plaintiff has produced no evidence in response that raises a genuine issue of material fact.

IV

CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted.

\* Affirmed. *Andrade* v. *Lego Systems, Inc.*, 188 Conn. App.    ,    A.3d (2019).

[1] While the plaintiff argues that meeting the *McDonnell Douglas Corp.* test is not the only way to establish illegal discrimination, he agrees that this case lends itself to an analysis under that test. Plaintiff's Brief, p. 9. He also has not proffered another basis to analyze his claim.