******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# APPENDIX

## NAILIA VODOVSKAIA-SCANDURA *v.* HARTFORD HEADACHE CENTER, LLC, ET AL.*

Superior Court, Judicial District of Hartford

File No. CV-13-6044074-S

Memorandum filed October 31, 2017

*Proceedings*

Memorandum of decision on defendants' motion for summary judgment. *Motion granted in part.*

*A. Paul Spinella*, for the plaintiff.

*Steven C. Rickman, Hugh W. Cuthbertson* and *Cristina Salamone*, for the defendants.

*Opinion*

BRIGHT, J.

## I

## INTRODUCTION

This action arises out of the plaintiff's employment with the defendant Hartford Headache Center, LLC (LLC). The defendant Tanya Bilchik is the sole member of the LLC. The plaintiff's second amended complaint dated April 29, 2015, alleged twelve causes of action related to how the plaintiff was treated while employed by the LLC. The defendants have moved for summary judgment as to all twelve counts. The LLC also seeks summary judgment on its six count counterclaim, which alleges that the plaintiff converted and stole records belonging to the LLC, including certain confidential patient records. In response, the plaintiff concedes that judgment should enter for the defendants on ten of the twelve counts of her complaint. She argues, however, that there are genuine issues of material fact as to her intentional infliction of emotional distress claim (ninth count) and her negligence claim (eleventh count). As to the counterclaim, the plaintiff does not deny taking the records in question, but argues that the LLC's claims are time barred. Consequently, the plaintiff asks that summary judgment enter in her favor on all six counts of the counterclaim.

The bases for the intentional infliction of emotional distress claim, as pled in the second amended complaint, are that the defendants misrepresented to others that the plaintiff had engaged in improper conduct and a lack of integrity in the performance of her professional duties; the defendants solicited false complaints about the plaintiff from patients and included those falsities in patient medical records and charts; and the defendants, in an effort to distort the plaintiff's professional achievements, omitted materials from her personal file that reflected favorably on her performance as a physician. In their motion for summary judgment, the defendants argue that none of these allegations, even if true, are sufficiently extreme or outrageous to support a claim of intentional infliction of emotional distress.

The basis for the plaintiff's negligence claim is her allegation that the defendants refused to allow the plaintiff to leave work to see a doctor for abdominal pain she was experiencing. She claims that as a result of the defendants' conduct, her treatment was delayed, and as a result of the delay she suffered complications, including infertility. The defendants argue that they owed the plaintiff no duty; they, in fact, did tell the plaintiff to leave work and see a doctor when she complained of the pain; and that there is no competent evidence that any delay in treatment caused the harm she is claiming.

Following argument on the defendants' motion for summary judgment, the plaintiff filed a request to amend her complaint. Attached to her request was her proposed fourth amended revised complaint.[1] The proposed amended revised complaint is limited to just the intentional infliction of emotional distress (first count) and negligence (second count) claims. It, thus, removes the other claims as to which the plaintiff agreed that summary judgment could enter. The proposed amended revised complaint also adds allegations of mistreatment, primarily in support of the plaintiff's claim of intentional infliction of emotional distress. In particular, the proposed revisions allege that the defendants' office manager, Denise McGrath, created a hostile work environment by intimidation, humiliation, constant criticism and bullying of the plaintiff. Specifically, the plaintiff alleges that she was bullied to maximize billable hours, including forcing patients to come in when not medically required. The plaintiff also alleges that she was constantly criticized for not bringing in new patients and for how she conducted herself professionally. As to the negligence claim, the proposed amended revised complaint specifies that the abdominal pain the plaintiff suffered from was appendicitis and specifies the date she reported the pain to the defendant as October 3, 2011.

The defendants opposed the filing of the proposed amended revised complaint because it would unduly prejudice them and was an attempt to "end run" the defendants' motion for summary judgment. By an order issued today, the court overruled the defendants' objection because the allegations set forth in the proposed amendment were known to the defendants in that the plaintiff testified to them at her deposition in October, 2016, and because the amendments do not affect the nature of the defendants' arguments or the court's analysis. Specifically, the court must still determine whether the new allegations are sufficiently extreme and outrageous to support a claim of intentional infliction of emotional distress. Consequently, the court will consider the defendants' motion for summary judgment in light of the allegations in the fourth amended revised complaint.

II

DISCUSSION

The summary judgment standard is well established. "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Stuart* v. *Freiberg*, 316 Conn. 809, 820, 116 A.3d 1195 (2015). "[T]he genuine issue aspect of summary judgment requires the parties

to bring forward before trial evidentiary facts, or substantial evidence outside the pleadings, from which the material facts alleged in the pleadings can warrantably be inferred. . . . A material fact has been defined adequately and simply as a fact which will make a difference in the result of the case." (Citation omitted; internal quotation marks omitted.) *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 556, 791 A.2d 489 (2002).

"[T]he burden of showing the nonexistence of any material fact is on the party seeking summary judgment." (Internal quotation marks omitted.) *Tuccio Development, Inc.* v. *Neumann*, 114 Conn. App. 123, 126, 968 A.2d 956 (2009). "To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue." (Internal quotation marks omitted.) *Ferri* v. *Powell-Ferri*, 317 Conn. 223, 228, 116 A.3d 297 (2015).

The evidence, viewed in light most favorable to the plaintiff, establishes the following material facts. In January, 2011, following the plaintiff's residency in the neurology department at the University of Connecticut Health Center and Hartford Hospital, Bilchik offered the plaintiff a staff position in the LLC, which the plaintiff accepted. The plaintiff worked as a physician for the LLC until June 30, 2012, when her employment was terminated. During her employment with the LLC a number of disputes arose between the plaintiff and the defendants. Over the course of the plaintiff's employment, the defendants demanded that the plaintiff require patients to come into the office for visits, even though the plaintiff believed that the visits were neither medically indicated nor appropriate. On a nearly daily basis she was disrespected and demeaned by Bilchik and the LLC's office manager, McGrath, who questioned the plaintiff's competence and complained that the plaintiff was not generating enough revenue for the LLC. Bilchik and McGrath also criticized and harassed the plaintiff for her refusal to write a letter attesting to the poor performance of an employee of the LLC. While the plaintiff also claims that the defendants solicited untrue complaints about her from patients, the undisputed facts prove otherwise. In each of the three instances identified by the plaintiff, the undisputed evidence shows that the patient first expressed his or her

dissatisfaction with the plaintiff, and that Dr. Bilchik made a note in the patient's file to reflect that feeling and/or asked the patient to put it in writing. The evidence, viewed in a light most favorable to the plaintiff, does establish, however, that McGrath tried to get at least one former employee of the LLC to write a complaint against the plaintiff, but the employee refused to do so. Knowing that her relationship with the defendants had soured, the plaintiff reviewed her personnel file in anticipation of leaving the LLC. When she did so, she noticed that certain materials that reflected positively on her performance and background were missing.

On October 3, 2011, the plaintiff returned to work following her three week honeymoon trip. When she returned to work she had no paid vacation or personal leave time remaining. Upon returning to work she reported to McGrath that she did not feel well. McGrath told the plaintiff that she had no additional leave time to take, had a full schedule of patients to see, and that if she felt she needed to see a doctor she would have to do so on her own time. The plaintiff made no attempt to seek medical treatment at any time on October 3. On October 4, she reported to work and again told McGrath that she did not feel well. In particular, she reported having abdominal pain. McGrath, also a nurse, has averred in her affidavit that she offered to conduct an examination of the plaintiff and did so. The plaintiff does not deny that such an examination occurred. She simply cannot recall whether it occurred. McGrath has also averred that she told the plaintiff to leave around mid-day on October 4 so that she could seek medical treatment. She has also averred that the plaintiff did in fact leave work mid-day on October 4. Again, the plaintiff does not dispute McGrath's claims. Instead, she has testified that she cannot recall what time she left work on October 4. The plaintiff did not seek medical treatment until approximately 7 p.m. on October 4. At that time, the doctor who saw her ordered an abdominal CT scan for October 6. The plaintiff was given time off from work to go for the CT scan. The test revealed that the plaintiff had acute appendicitis and needed emergency surgery, which was performed.

Following the surgery, the plaintiff had difficulty becoming pregnant. She attributes those difficulties to the fact that her treatment for appendicitis was delayed from when she first felt symptoms on October 3 until her operation on October 6. The only opinion testimony she offers in support of her conclusion is her own. The plaintiff is board certified in internal medicine, but is not board certified in fertility medicine or as an OB/GYN.

As to the LLC's counterclaims, it is undisputed that while still employed by the LLC the plaintiff removed records from the files of patients and other employees that she believed related to her and supported her

claims of mistreatment by the defendants. The defendants first learned that the plaintiff removed these records when she testified to taking the records at her deposition on October 10, 2016. Thereafter, the LLC sought leave to assert its counterclaim on December 5, 2016.

## A

### Intentional Infliction of Emotional Distress

In the first count of her fourth amended revised complaint the plaintiff claims that the defendants' treatment of her constitutes intentional infliction of emotional distress. "In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury." (Citations omitted; internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 210, 757 A.2d 1059 (2000).

"Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous! . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citations omitted; internal quotation marks omitted.) Id., 210–11.

Our appellate courts have applied the above test a number of times to claims by employees against their employers. For example, in *Appleton*, the Supreme Court held that the trial court properly granted summary judgment for the defendant where the evidence, viewed in a light most favorable to the plaintiff, established that the defendant "made condescending comments to [the plaintiff] in front of [her] fellow colleagues questioning [her] vision and ability to read; telephoned the plaintiff's daughter, representing that the plaintiff

had been acting differently and should take a few days off from work; and telephoned the police, who came to the school and escorted the plaintiff out of the building to her car. The plaintiff also asserted in her affidavit that she was subjected to two psychiatric examinations at the request of the board, and that she was forced to take a suspension and a leave of absence and, ultimately, forced to resign." (Internal quotation marks omitted.) Id., 211. The court held that "[t]hese occurrences may very well have been distressing and hurtful to the plaintiff. They do not, however, constitute extreme and outrageous conduct . . . . As the defendants' actions in the present case were not so atrocious as to exceed all bounds usually tolerated by decent society, their conduct is insufficient to form the basis of an action for intentional infliction of emotional distress." (Citations omitted.) Id., 211–12.

In *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 43 A.3d 69 (2012), the plaintiff's intentional infliction of emotional distress claim was based on allegations and evidence that the defendants told the plaintiff that her job was in jeopardy and subsequently subjected her to adverse actions, including transfer, based on unsubstantiated and false accusations. Again viewing the evidence in a light most favorable to the plaintiff, the Supreme Court held that no reasonable jury could conclude that the conduct was so extreme or outrageous as to support a claim for intentional infliction of emotional distress. Id., 527. The court, thus, reversed the trial court's denial of the defendants' motion for a directed verdict. Id., 530–31.

In *Tracy* v. *New Milford Public Schools*, 101 Conn. App. 560, 567–68, 922 A.2d 280, cert. denied, 284 Conn. 910, 931 A.2d 935 (2007), the plaintiff alleged that "[the defendants] harassed, intimidated and defamed him in the workplace and disciplined him without conducting a proper investigation." The trial court, assuming these allegations to be true, granted the defendants' motion to strike the plaintiff's claim of intentional infliction of emotional distress because the allegations were not sufficiently extreme or outrageous. Id., 568. The Appellate Court affirmed the trial court's decision. Id., 570.

Similarly, the Appellate Court affirmed the granting of a motion to strike in *Dollard* v. *Board of Education*, 63 Conn. App. 550, 777 A.2d 714 (2001). There, the plaintiff alleged that "[i]n 1998 and early 1999, the defendants jointly engaged in a concerted plan and effort to force the plaintiff to resign from her position or to become so distraught that they would have a colorable basis for terminating her employment. The defendants carried out their plan by hypercritically examining every small detail of her professional and personal conduct. Specifically, the defendants transferred the plaintiff to a school where she did not want to be assigned and then secretly hired someone to replace her at the school

from which she had been transferred. The defendants also publicly admonished the plaintiff for chewing gum, being habitually late, being disorganized and not using her time well. Finally, the defendants unnecessarily placed the plaintiff under the intensive supervision of a friend of [one of the defendants]. The defendants ultimately forced the plaintiff to resign." Id., 552–53. The court held that such conduct did not constitute extreme and outrageous behavior. Id., 554–55. The Appellate Court reached a similar conclusion when it affirmed the trial court's grant of summary judgment in *Gillians* v. *Vivanco-Small*, 128 Conn. App. 207, 213, 15 A.3d 1200 ("The most troubling allegation is that the defendants vindictively conspired to terminate the plaintiff's employment. A concerted effort to remove an employee, however, does not necessarily constitute outrageous conduct . . . ." [Citation omitted.]), cert. denied, 301 Conn. 933, 23 A.3d 726 (2011).

Finally the Appellate Court's decision in *Bator* v. *Yale-New Haven Hospital*, 73 Conn. App. 576, 808 A.2d 1149 (2002), cert. denied, 279 Conn. 903, 901 A.2d 1225 (2006), is particularly relevant to the court's analysis of the plaintiff's claim here. In *Bator*, the "complaint alleged that the plaintiff was employed by the defendant as a respiratory therapist in February, 1989. During the course of his employment, the defendant's agents, servants and employees subjected him to abusive and disparate treatment. Specifically, the plaintiff alleged, among other things, that his supervisor once scheduled him to report for duty when he was under a physician's care. When the plaintiff failed to report as scheduled, the supervisor recommended that he be disciplined. The plaintiff alleged further that he received less compensation than other, less experienced employees in his position. When a nurse accused the plaintiff of being rude to her, a supervisor falsely accused the plaintiff of endangering a patient's life. One of his supervisors suggested that the plaintiff seek psychiatric help when he complained about his schedule and assignments. Another of his supervisors recommended that the plaintiff attend anger management classes after he had a confrontation with a nurse. When the plaintiff complained about a change in his monthly rotation assignment, he was given a written warning. Following another verbal altercation with a nurse about a patient's care, the plaintiff's supervisor gave him a final written warning for violence. The plaintiff further alleged that as a result of the alleged disparate treatment he received in the defendant's employ, he suffered severe emotional distress that he could no longer endure and resigned on March 28, 2001." Id., 577–78. The Appellate Court affirmed the decision of the trial court striking the plaintiff's claim for intentional infliction of emotional distress. In doing so, it concluded that "[o]n the basis of our plenary review of the plaintiff's complaint, taking the facts together or in isolation, we cannot say that

this case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, [Outrageous! . . . Conduct] on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citation omitted; internal quotation marks omitted.) Id., 579.

In this case, the evidence, viewed in a light most favorable to the plaintiff, establishes that the defendants were openly critical of the plaintiff as to the number of patients she saw and the amount of billings she generated. Bilchik and McGrath not only repeatedly expressed their displeasure directly to the plaintiff, but also discussed with the staff their dissatisfaction with the plaintiff, and they sought negative comments about the plaintiff from staff. They also included negative comments they received from patients in various files and records. They also removed positive material about the plaintiff from her personnel file. They also criticized and harassed the plaintiff for her refusal to write a negative letter about another employee of the LLC. Furthermore, the plaintiff has submitted evidence that McGrath told the plaintiff that she could not leave work on October 3, 2011, to see a doctor. Instead, the plaintiff was told that she would have to do so on her own time. Finally, Bilchik and McGrath threatened the plaintiff with firing if she did not see more patients. These allegations are remarkably similar to the allegations and facts set forth in the cases above, which our Supreme and Appellate Courts have deemed insufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress.

The plaintiff has not cited a single appellate court case involving an employment relationship that has come to a different conclusion. Instead, the plaintiff relies on three Superior Court cases in which the court denied a motion to strike an intentional infliction of emotional distress claim based on an ongoing pattern of harassment and/or defamation in the workplace. The court finds that each of those cases is either distinguishable from the evidence presented here or not persuasive in light of the appellate authority discussed above.

In *Stanley Black & Decker, Inc.* v. *Krug*, Superior Court, judicial district of New Britain, Docket No. CV-14-6027247 (May 7, 2015) (*Abrams, J.*) (60 Conn. L. Rptr. 311), the defendant alleged, inter alia, in her counterclaim a claim for intentional infliction of emotional distress. Id., 312. The basis for the claim was the defendant's claim that "shortly after the defendant's first month of employment the working conditions became intolerable because the defendant's immediate supervisor 'would continuously bully, berate, ridicule and belittle' the defendant, 'created a feeling of paranoia

amongst employees,' 'led a personal smear campaign' against the defendant, baselessly disparaged the defendant to her coworkers and management, and repeatedly harassed the defendant." Id. Based on these allegations, Judge Abrams concluded that he "[could not] say as a matter of law that this conduct was not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress." Id., 313. The allegations in *Krug* were much broader and less specific than what the evidence, viewed in a light most favorable to the plaintiff, establishes here. The evidence presented is that the defendants harassed the plaintiff and threatened to terminate her because they were unhappy with the plaintiff's job performance, particularly as it related to seeing and billing clients. Furthermore, the unrebutted evidence presented by the defendants shows that any patient complaints originated with the patients and were then documented by the defendants. In addition, the defendants' attempts to get other workers to write negative comments about the plaintiff resulted in no such complaints. Finally, McGrath's comments to the plaintiff on October 3, 2011, that she could not leave work to see a doctor was based on the fact that the plaintiff had used all of her vacation and personal time. This last fact is very similar to one of the allegations in *Bator*, which the Appellate Court did not find extreme and outrageous. In addition, the court believes that the analysis in *Krug* is inconsistent with the holdings in *Tracy*, *Dollard*, *Gillians* and *Bator*. For these reasons, the court is not persuaded that *Krug* is persuasive authority for denying the defendants' motion for summary judgment as to the intentional infliction of emotional distress claim.

The plaintiff's reliance on *Savage* v. *Andoh*, Superior Court, judicial district of New Haven, Docket No. CV-07-5015657-S (April 11, 2008) (*Bellis, J.*) (45 Conn. L. Rptr. 493), and *Leone* v. *New England Communications*, Superior Court, judicial district of New Britain, Docket No. CV-01-0509752-S (April 10, 2002) (*Quinn, J.*) (32 Conn. L. Rptr. 72), is even less persuasive. In those cases Judges Bellis and Quinn gave great weight to the fact that the alleged harassing behavior involved racial and/or ethnic slurs.

Judge Bellis made specific note of this in *Savage*. "In *Leone* v. *New England Communications*, [supra, 32 Conn. L. Rptr. 73] Judge Quinn denied the defendant employer's motion to strike where the complaint alleged that the owners of the company referred to the plaintiff employee as 'dago, wop, Father Sarducci or Gimabroni,' made offensive comments to the plaintiff about homosexuality and his sexual performance, and placed sexually offensive comments and pictures on his computer. [Id.] The court noted that 'there is a strong public policy expressed by statute in our state prohibiting discrimination on the basis of race, sex or national origin.' Id. Based on this public policy and the

factual allegations, the court found 'these comments so outrageous in character, and so extreme in degree so as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.' . . ." *Savage* v. *Andoh*, supra, 45 Conn. L. Rptr. 495. Based on *Leone* and other cases that found similar slurs to be sufficient, Judge Bellis concluded that the plaintiff's allegations of anti-Semitic comments by her supervisor, combined with the other allegations of her complaint sufficient to survive a motion to strike. Id., 496.

The plaintiff here has not alleged any racial, ethnic or similar type slurs or animus. Her allegations, and the evidence related to them, are more of the garden variety employee related claims that our appellate courts have found insufficient to support a claim for intentional infliction of emotional distress. Furthermore, both *Savage* and *Leone* were decided at the pleading stage and not based on a factual record, as is the case here. In fact, ultimately in *Savage* summary judgment was granted for the defendants when the plaintiff could not prove the conduct alleged in the complaint. *Savage* v. *Andoh*, Docket No. CV-07-5015657-S, 2013 WL 951173, *20–21 (Conn. Super. February 6, 2013) (*B. Fischer, J.*).

Overall, the evidence submitted, viewed in a light most favorable to the plaintiff, does not establish conduct that a reasonable jury could conclude constituted extreme and outrageous behavior. Consequently, the defendants are entitled to summary judgment on the first count of the fourth amended revised complaint.

B

Negligence

As noted above, the plaintiff's negligence count alleges that the defendants were negligent in not allowing the plaintiff to leave work on October 3, 2011, to see a doctor. The plaintiff alleges that as a result of this negligence the plaintiff's treatment for her appendicitis was delayed and she suffered complications, including infertility.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." (Internal quotation marks omitted.) *Mazurek* v. *Great American Ins. Co.*, 284 Conn. 16, 29, 930 A.2d 682 (2007). Generally, "[i]ssues of negligence are ordinarily not susceptible of summary adjudication but should be resolved by trial in the ordinary manner." (Internal quotation marks omitted.) *Fogarty* v. *Rashaw*, 193 Conn. 442, 446, 476 A.2d 582 (1984). However, the "issue of whether a defendant owes a duty of care is an appropriate matter for summary judgment because the question is one of law." (Internal quotation marks omitted.) *Mozeleski* v. *Thomas*, 76 Conn. App. 287, 290, 818 A.2d 893, cert. denied, 264 Conn. 904, 823 A.2d 1221 (2003). "The exis-

tence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." (Internal quotation marks omitted.) *Sic* v. *Nunan*, 307 Conn. 399, 407, 54 A.3d 553 (2012). In addition, "[a]lthough the issue of causation generally is a question reserved for the trier of fact . . . the issue becomes one of law when the mind of a fair and reasonable person could reach only one conclusion, and summary judgment may be granted based on a failure to establish causation." (Internal quotation marks omitted.) *Abrahams* v. *Young & Rubicam, Inc.*, 240 Conn. 300, 307, 692 A.2d 709 (1997).

The defendants first claim that they owed no duty to the plaintiff to tell her she was free to leave work to go to a doctor and that their failure to do so cannot expose them to a claim that the plaintiff suffered some adverse medical consequence because she was delayed in getting to the doctor. In making this argument, the defendants note that this is not a medical malpractice case. The plaintiff does not claim that she was in the medical care of the defendants. Instead, the plaintiff's claim is that an employer owes a duty to accommodate a request of an employee to leave work to see a doctor and if the employer fails to do so, it can be sued for any adverse effects suffered by the employee because treatment was delayed.

"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Although it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury [that] resulted was foreseeable . . . . [T]he test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Internal quotation marks omitted.) *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 649–50, 126 A.3d 569 (2015). That an injury is foreseeable does not "mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for prag-

matic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself . . . but is only an expression of the sum total of those considerations of policy [that] lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results. . . . [I]n considering whether public policy suggests the imposition of a duty, we . . . consider the following four factors: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions. . . . [This] totality of the circumstances rule . . . is most consistent with the public policy goals of our legal system, as well as the general tenor of our [tort] jurisprudence." (Internal quotation marks omitted.) Id., 650–51.

As to foreseeability, the facts, viewed in a light most favorable to the plaintiff, are as follows. Although her testimony as to when she reported to McGrath that she felt ill is less than clear, it is possible to read her deposition such that she reported not feeling well upon her return from her honeymoon on October 3, 2011. In response to being so notified by the plaintiff, McGrath told the plaintiff that she would need to go to the doctor on her own time because she had a full schedule of patients to see. The question then is whether the defendant could reasonably have foreseen from the plaintiff's statement that she did not feel well that waiting to see a doctor until a time when the plaintiff was not occupied with work duties, whether during a lunch break or after the workday, would lead to a significant medical complication, including the alleged infertility.

The court concludes that an ordinary person in the situation of the defendants would not reasonably foresee the consequences claimed by the plaintiff. It is not unusual for employees to report to work and tell their employer that they are not feeling well or suffering from some aliment. An ordinary employer would not be expected to reasonably foresee from such a complaint that serious complications might develop if not treated immediately or within hours. In fact, the ordinary employer would expect that the employee, who knows better than anyone how they are feeling, would take responsibility for their own medical care if they truly felt in distress. This conclusion is particularly apt here when the only evidence of what the plaintiff reported on October 3, 2011, was that she was not feeling well.

There is evidence that when the plaintiff came to work on October 4, 2011, she reported abdominal pain, vomiting, nausea and diarrhea that all started that morn-

ing. This evidence might have put the defendants on greater notice as to the foreseeable consequences of a delay in treatment. However, the plaintiff does not and cannot rely on the complaints on October 4 because the unrebutted evidence submitted by the defendants is that McGrath conducted an examination of the plaintiff on October 4 and told her to leave mid-day so that the plaintiff could see a doctor. McGrath's unrebutted testimony is that the plaintiff in fact left work mid-day on October 4. The plaintiff does not deny that she was examined by McGrath or that she left work mid-day on October 4. She testified that she simply does not recall. Consequently, even if the court were to determine that the defendants owed the plaintiff a duty on October 4, 2011, not to delay her treatment, the undisputed evidence is that they did not delay her treatment that day. Recognizing this problem, the plaintiff has amended her complaint to specifically allege that she first reported feeling ill on October 3. Consequently, the question is whether the general nature of the harm alleged by the plaintiff was foreseeable on October 3. For the reasons set forth above, it was not.

Furthermore, even if the court determined that the plaintiff's alleged injuries were foreseeable on October 3 or that the plaintiff might be able to prove a breach of a duty, assuming, one existed, on October 4, the court would still need to conduct the second part of the duty analysis and determine whether as a matter of public policy, an employer owes a duty to an employee to make sure she has access to prompt medical care if she complains of an ailment. Although the parties did not address the four public policy factors, the court will.

First, the normal expectations of employers and employees is not that employers take responsibility for an employee's health and welfare other than the employee's actual working conditions. Our legislature has by statute spelled out an employer's obligation to its employees. General Statutes § 31-49 provides: "It shall be the duty of the master to exercise reasonable care to provide for his servant a reasonably safe place in which to work, reasonably safe appliances and instrumentalities for his work and fit and competent persons as his colaborers and to exercise reasonable care in the appointment or designation of a vice-principal and to appoint as such vice-principal a fit and competent person. The default of a vice-principal in the performance of any duty imposed by law on the master shall be the default of the master." Nothing in the statute imposes any duty on the employer to insure that its employees are permitted to leave work as necessary to seek medical treatment. In fact, in October, 2011, Connecticut law did not require that every employer provide its employees with paid medical leave. Thus, many employees could have been in the position of waiting until nonwork hours to seek medical treatment

or risk loss of pay or other discipline by their employer.

Second, the public policy regarding the interplay of employers and employees is spelled out in great detail by our legislature in several statutes. The fact that the legislature has heavily regulated this relationship weighs against the court judicially creating duties and rights between the parties.

Third, imposition of a duty on an employer to insure prompt medical treatment of a sick employee will no doubt lead to increased litigation. Furthermore, the creation of such a duty would have the perverse effect of discouraging employees from taking primary responsibility for their own health. For this reason, creating a cause of action is an inefficient and costly way of insuring that employees seek treatment for medical ailments.

Finally, the plaintiff has not cited a single case from another jurisdiction that has recognized such a duty, and the court is not aware of any. The closest this court could find to a claim such as that alleged here by the plaintiff is *Coste* v. *Riverside Motors, Inc.*, 24 Conn. App. 109, 585 A.2d 1263 (1991). In that case, the employee sued his employer for not allowing him to leave work during the early stages of a snowstorm. The employee claimed that by the time he was permitted to go home the conditions had worsened and he ended up in a motor vehicle accident as a result. The Appellate Court affirmed the trial court's ruling striking the complaint because the plaintiff could not allege that the employer's decision was the proximate cause of the accident. While the court was not required to address whether the defendant owed the plaintiff any duty regarding the decision of when to allow its employees to leave work, the court did note: "The implication of the delict is that an employer has a duty to ensure an employee a safe trip home or a duty to prevent an employee from driving in hazardous weather. Although we know of no case, statute or principle of common law that places such a duty on an employer, we need not reach the issue because we conclude that legal causation has not been sufficiently alleged." (Footnote omitted.) Id., 112. Similarly, this court knows of no case, statute or principle of common law that would impose on the defendants the duty alleged by the plaintiff.

Overall, none of the four public policy factors support creation of the duty suggested by the plaintiff. Consequently, the court concludes that the defendants did not owe the plaintiff a duty to insure that she was given time off from work to seek medical treatment when she complained of not feeling well, and the defendants are entitled to summary judgment on the second count of the fourth amended revised complaint.

The defendants further argue that even if the court does find that they owed the plaintiff the duty alleged, the plaintiff has failed to present competent evidence

that any breach of that duty by the defendants caused the plaintiff's claimed harm. "Causation is an essential element of a cause of action in negligence. . . . [A] plaintiff must establish that the defendant's conduct legally caused the injuries. . . . The first component of legal cause is causation in fact. Causation in fact is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct. . . . The second component of legal cause is proximate cause . . . . [T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries. . . . Further, it is the plaintiff who bears the burden to prove an unbroken sequence of events that tied his injuries to the [defendant's conduct]. . . . The existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection. . . . This causal connection must be based upon more than conjecture and surmise." (Citation omitted; internal quotation marks omitted.) *Kumah* v. *Brown*, 130 Conn. App. 343, 347, 23 A.3d 758 (2011). While the issue of causation is typically for the jury, where evidence of the connection between the defendant's conduct and the plaintiff's injuries is attenuated or would call for conjecture on the part of the fact finder, the issue can be resolved on summary judgment. Id., 350–51.

As noted above, the only evidence the plaintiff has regarding causation is her opinion testimony that the delay in treatment of her appendicitis led to complications, including her infertility. The plaintiff's opinion, though, makes no attempt to relate any particular period of delay to the alleged complications. For example, the plaintiff now claims in the fourth amended revised complaint that she first complained of not feeling well upon her return to work on October 3, 2011. However, it is undisputed that the plaintiff made no attempts to seek medical treatment after her workday ended on October 3. The plaintiff has presented no evidence, expert or otherwise, tying the delay in treatment, from her first complaint on October 3 to her first opportunity to seek treatment later that day, to her alleged injuries. This is crucial because the only evidence as to October 4 is that when the plaintiff complained of injuries that day she was examined by McGrath and permitted to leave work mid-day. For whatever reason though, the plaintiff did not seek medical treatment until approximately 7 that evening. Again, the plaintiff has presented no evidence as to the effect of the delay caused by her own decision not to seek treatment until later that evening. Finally, although the plaintiff sought treatment on October 4, her CT scan and surgery did not occur until October 6. The plaintiff does not claim that the delay from October 4 to October 6 was in any way the fault of the defendants. In fact,

she admits that she was given time off from work on October 6 to have the CT scan performed. The plaintiff has presented no expert opinion differentiating any harm from this delay from the harm associated with the only delay, based on the evidence, that can be attributed to the defendants—the hours on October 3 between when she first complained of discomfort and when she could have sought treatment that evening. In the end, the plaintiff's evidence of proximate cause is full of gaps that would require the fact finder to engage in conjecture and speculation as to whether the alleged negligence of the defendants was a substantial factor in bringing about her alleged injury. See, e.g., *Coste* v. *Riverside Motors, Inc.*, supra, 24 Conn. App. 115 ("[t]he defendant's conduct is too inconsequential to the ultimate harm to the plaintiff, considering the many other variables, to rise to the level of proximate cause"). Because, based on the evidence presented, no reasonable jury could find that the defendants' alleged conduct proximately caused the plaintiff's claimed injuries, the defendants are entitled to summary judgment on the second count of the fourth amended revised complaint.

C

### LLC's Counterclaim

Whether the LLC is entitled to summary judgment on the six counts of its counterclaim turns on application of the statute of limitations. The plaintiff claims that all six counts are barred by General Statutes § 52-577, which requires that any claim in tort be brought within three years from the date of the act or omission complained of. She argues that the LLC's counterclaim was not brought until January, 2017, yet alleges wrongful conduct that took place while the plaintiff was employed by the LLC. She argues that because her employment with the LLC ended in June, 2012, it is clear that the counterclaim is untimely and that she is entitled to summary judgment on all six counts.

The LLC's only response to the plaintiff's argument is that it did not learn of the plaintiff's conduct until her deposition in October, 2016. Thereafter, the LLC immediately sought to plead its counterclaim in December, 2016. The LLC argues, relying on General Statutes § 52-595, that the three year limitation period in § 52-577, was tolled due to the plaintiff's concealment of her conduct. Section 52-595 provides: "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence." "[T]o prove fraudulent concealment, the plaintiffs [must] show: (1) [the] defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) [the] defendant's intentional concealment of these facts from the plaintiffs; and (3)

[the] defendant's concealment of the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action. . . . To do so, it [is] not sufficient for the plaintiffs to prove merely that it was more likely than not that the defendants had concealed the cause of action. Instead, the plaintiffs [must] prove fraudulent concealment by the more exacting standard of clear, precise, and unequivocal evidence." (Citation omitted; internal quotation marks omitted.) *Weiner* v. *Clinton*, 106 Conn. App. 379, 387, 942 A.2d 469 (2008).

Neither party has submitted any evidence regarding the elements that the LLC must prove to establish fraudulent concealment. As the party moving for summary judgment, the LLC has failed to meet its burden. Consequently, its motion for summary judgment on the six counts of its counterclaim is denied. The plaintiff, having never actually moved for summary judgment on the counterclaim, is not entitled to have it enter based solely on her opposition to the defendant's motion for summary judgment.

### III

### CONCLUSION

For all of the foregoing reasons, the defendants' motion for summary judgment as to the first and second counts of the plaintiff's fourth amended revised complaint is GRANTED. The LLC's motion for summary judgment as to each of the six counts of its counterclaim is DENIED.

* Affirmed. *Vodovskaia-Scandura* v. *Hartford Headache Center, LLC*, 192 Conn. App. 559,      A.3d      (2019).

[1] It does not appear that the plaintiff ever filed a third amended complaint. Nevertheless, because the plaintiff has labeled it as such, the court will refer to the proposed amended revised complaint as the fourth.